# Richmond

## HARRY BARR V. T. MILES MACGLOTHLIN.

November 25, 1940.

Record No. 2274.

Present, Campbell, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Bernard Glasser* and *Herman A. Sacks,* for the plaintiff in error.

*Rixey & Rixey,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

T. Miles MacGlothlin, hereinafter referred to as the plaintiff, desired to sell his home in the city of Norfolk. He placed the property for sale with the Truitt Realty Corporation, a real estate broker, of which corporation Irvin S. Truitt was an officer and Mrs. Chapman a saleswoman.

Mrs. Chapman took Mrs. Frances Barr and Miss Barr, the wife and daughter of Harry Barr, to the house on the afternoon of Friday, February 17, 1939, and showed them through it. By agreement, Mr. and Mrs. Barr, Miss Barr and Mrs. Chapman met MacGlothlin at the house on the night of the same day. The Barrs inspected the house and the grounds and Mr. Barr asked MacGlothlin to put a price on the property. MacGlothlin told him he wanted $13,500 for it; but, after some negotiations, he agreed to accept Barr's offer of $12,000. A memorandum of a contract of sale was drawn up by Barr and signed by him and Mac-Glothlin, and a $100 check was given in part payment of the purchase price.

On the following day, February 18th, the parties duly executed a formal contract of sale containing a provision that settlement was to be made on or before 18th of March, 1939, "or as soon thereafter as title can be examined and papers prepared, allowing a reasonable time to correct any defects reported by the title examiner."

On February 21st, Barr and his wife called at the MacGlothlin house and asked MacGlothlin to release them from the contract, to which the latter declined to agree. Thereafterwards, Barr, on February 28th, wrote Mrs. Chapman, in care of the Truitt Realty Corporation, the following letter authorizing her to make a resale of the property:

"I hereby authorize you to sell house and lot located on North Shore Road, in Algonquin Park, house formerly belonging to T. M. MacGlothlin, retaining 50% of the selling price if sold above $12,000."

In accordance with the authority contained in the letter, the Truitt Realty Corporation and Mrs. Chapman undertook, through public advertisement and personal contact, to make a resale of the property. No new purchaser having been found as the settlement date under the contract approached, MacGlothlin says he agreed to a thirty-day extension of that date at the request of Barr made through Mrs. Chapman.

On March 20, 1939, this agreement was confirmed in a letter from Mr. J. Barbour Rixey, the attorney then representing MacGlothlin, to Barr, as follows:

"In regard to the purchase of the property from Mr. T. M. MacGlothlin, he understood that you desired a 30 day extension of the settlement date, and he agreed to said extension.

"Will you kindly advise us when you will be prepared to settle with Mr. MacGlothlin in accordance with your contract?"

Subsequent negotiations between the parties were conducted by Mr. Rixey, representing MacGlothlin, and by Mr. Theodore S. Garnett, an attorney then representing Barr.

Garnett, under date of April 6, 1939, replied to the above letter as follows:

"Your letter of the 20th of March addressed to Mr. Harry Barr has been handed to me for reply.

"I am directed to say that he has never desired an extension of the settlement date, and no extension has been asked or agreed upon by him, that in view of the statement of Mr. MacGlothlin's agent that she did not think Mrs. MacGlothlin would sign the deed, and since the date fixed for settlement has long since passed, he considers the contract no longer binding on him."

Rixey, on April 7th, wrote as follows to Garnett:

"We are indeed surprised to receive your letter as Mr. Barr requested an extension, which was granted. Upon receipt of my letter of March 20th Mr. Barr informed the

agent that he was glad to receive said letter giving him an extension.

"We will, therefore, call upon Mr. Barr for prompt settlement."

On April 11, 1939, Rixey forwarded to Garnett a copy of the deed conveying the property from MacGlothlin and his wife to Barr, with the advice that MacGlothlin was prepared to settle at any time and expected settlement to be made not later than April 18, 1939.

Rixey testified that Garnett came to his office, on April 12th, and asked to see the deed; that he told him the deed, duly executed by MacGlothlin, was in the office of Mrs. MacGlothlin's attorney upstairs in the same building; that the deed was never mentioned again between him and Garnett; and that he did not know whether the latter went to look at the deed. He said that Garnett told him Barr could not afford to buy the property, because he had been unable to secure a loan sufficient to enable him to meet the purchase price. After some conversations, it was agreed between the two that Barr could have a week or two longer to see if he could find a purchaser for the property and if, in the meantime, MacGlothlin found one he would let Garnett know.

Rixey and Garnett again conferred on May 20th. At that time, Rixey told Garnett that MacGlothlin had been trying to sell the property and that he had received an offer of $10,000;; but that if Barr still wanted to take the property at $12,000 it could be arranged. Garnett thanked him for the information and said he would report to his client and let him hear from him later. About thirty minutes later, Garnett called him on the telephone and said that he had talked with his client, Barr, and that Barr had nothing more to say.

On June 7th, Rixey wrote to Garnett that, following the refusal of Barr to comply with his contract, MacGlothlin had been unsuccessful in his efforts to make a resale of the property for $12,000; but that he had found a purchaser for $10,000, and would allow the sale to proceed for the

account of Barr and look to him for the loss sustained. Sale was thereafter made through the Truitt Realty Corporation for $10,000 to W. G. Brinson, to whom a deed was executed and delivered by Mr. and Mrs. MacGlothlin, and the proceeds, less the cost of commission on the sale, paid to MacGlothlin. Garnett was notified by letter of Rixey, dated June 16th, that the sale had been completed, and that MacGlothlin demanded of Barr the sum of $2,500 to cover the loss sustained as a result of Barr's failure to comply with his contract.

Barr, a business man and resident of Norfolk for four or five years, said he was not familiar with the neighborhood where the property in question was located. He said that the plaintiff represented to him that the property was very close to a school; that he would not have bought it if it were not so situated; and that he relied upon the plaintiff's representation. He also said that he had an agreement with the plaintiff that the contract was not to become effective until the plaintiff's wife also signed it, because the plaintiff and his wife were living apart during the negotiations. After he had discovered, on Sunday afternoon, February 19th, that the school nearest the property was about eight-tenths of a mile away, he informed the plaintiff, on the following Tuesday night, that he did not intend to purchase the property since the school was much further away than it had been represented to be.

The plaintiff and his witnesses denied that there had been any representation made with reference to the proximity of the school, or that the agreement was not to become effective until the plaintiff's wife signed it. They further testified that these defenses were not advanced until the trial of this case; and that the only reason given by Barr and his wife for not carrying out the contract was that their daughter had become engaged to marry and they no longer needed the property for their family.

One of the best schools in Norfolk is located about 1,500 feet from the property, a distance of six or seven blocks,

according to Truitt, who said he measured the distance on a map.

Mrs. MacGlothlin, notwithstanding the difference with her husband, did, in fact, during the month of April, sign and acknowledge the deed from herself and husband to Barr for the property, which deed was ready for delivery to Barr, if the parties had come to an agreement at or before that time.

The evidence is that the property, a dwelling only 'five months old, was actually of about the same value when Barr refused to complete the contract as when the property was sold to Brinson in June, 1939.

The defendant excepted to the refusal of the trial court to permit Barr to testify orally as to his motives for writing the letter of February 28th, authorizing the resale of the property and reserving for himself a portion of any profit on such sale.

Upon the trial of this action, a jury's verdict of $2,150, in favor of the plaintiff, was sustained by the trial judge and judgment entered thereon.

The defendant assigns error to the refusal of the trial court to set aside the verdict of the jury as contrary to the law and the evidence, to the granting and refusing of instructions, and to the refusal to permit the defendant to testify to the inducement for the letter of February 28th.

The trial court instructed the jury that if they believed from the evidence that MacGlothlin was willing and able to perform his contract, as written, or on or before the expiration of an extension date, if such extension date was agreed upon by Barr or his agent, and that Barr failed to comply with his obligation, they should find for the plaintiff; that if Barr authorized a resale of the property, such resale was at his risk; that even though Barr signed the contract on a representation that a school was close to the property, yet if he further signed an authorization for its resale after he had ascertained the location of the school, then he was estopped to set up such representation as a defense; and that if a verdict was found for the plaintiff,

the measure of damages would be the difference between the contract price of $12,000, less the $100 paid and a reasonable rent charged the plaintiff, and the price at which the property was resold, less the real estate commission paid on the resale.

A number of instructions requested by the defendant, in conflict with the above instructions, were refused.

The principal ground of error relied upon in the brief and in the argument before us is as to the instruction relating to the measure of damages.

In discussing this assignment, it is necessary to analyze and evaluate the evidence in connection with the legal principles applicable. In doing this, we dispose of the assignments of error relating to the granting and refusing of other instructions and to the sufficiency of the evidence to support the verdict.

The defendant contends that the plaintiff, having elected to sue for damages for breach of the contract, was limited to recover only the difference between the contract price and the market value at the time of the breach of the contract, and since the market value of the property, at the time of the breach of the contract, was the same as the contract price, he was entitled to no recovery.

The general rule is that where there is a breach by the vendee of an executory agreement to purchase land and a subsequent resale, either public or private, by the vendor, the measure of damages ordinarily is the difference between the contract price and the saleable or market value at the time of the breach. If the resale is made within a reasonable time after the breach, the amount received is *prima facie* evidence of the saleable or market value at the time of the breach. *Definite Contract Building & Loan Association, et al.* v. *Tumin,* 158 Va. 771, 164 S. E. 562; *McDaniel* v. *Daves,* 139 Va. 178, 123 S. E. 663; Annotation, 52 A. L. R. at page 1512.

The general rule, however, is not applicable where a resale is effected by agreement or authorization of the vendee. *Mundy's Ex'rs* v. *Garland,* 116 Va. 922, 83 S. E.

491. The parties, undeniably, have the right to agree upon the method of ascertaining the damages.

The contract in evidence was a binding contract of sale between the parties. It was one that MacGlothlin had a right to make and one that he stood willing and able to perform. It was signed and acknowledged by his wife and he could have conveyed a good title if he had been called on for performance.

On February 28th, at least eighteen days before the date of settlement, Barr, in writing, authorized the re-sale of the property, specifically describing it as "the house formerly belonging to T. M. MacGlothlin." He reserved for himself 50% of the purchase price, if it sold over $12,-000. Unless he believed that he owned the house, or had the right to exact a conveyance, he could not have properly authorized its sale or shared in the proceeds therefrom. Yet, with full admitted knowledge of the alleged representations as to the location of a near-by school and the necessity of securing the signature of Mrs. MacGlothlin to make the contract binding, he drew up and signed the letter of authorization for a resale.

Barr's attempted explanation of writing the letter of February 28th, whatever his motive, was in conflict with the fixed and definite wording of the letter, and was, therefore, properly excluded. The letter disclosed a desire on the part of Barr to secure a portion of the proceeds of the resale of property which he described as "the house formerly belonging to T. M. MacGlothlin," if such sale could be made at a profit. The quoted language is directly contradictory of his contention that MacGlothlin had made no valid contract for the sale of the house to him. He should not have been allowed, under the circumstances, to take a position where he could claim a share of the profits in the sale of the house if profits were made, and hold himself not liable if a loss were suffered.

It is further illuminating to note that Garnett, the attorney representing Barr, did not rely upon any misrepresentations by MacGlothlin in defense of the refusal of Barr

to comply with his contract. There is no denial that the original excuse given by Garnett for his client's failure to comply with the contract was Barr's inability to secure a sufficient loan on the property; that on April 12th, an extension of time was granted Barr, through his attorney, to find a purchaser; or that Garnett had reported to his client on his conferences with Rixey about these matters, including the offer of Brinson to purchase the property for $10,-000. It is singular also that neither Barr nor Garnett made any protest after the letters of June 7th and June 16th, informing them of the proposed resale and the fact that MacGlothlin would look to Barr for the loss sustained on such resales. During all of this time, Barr made no attempt to revoke the letter of February 28th.

Barr refused, on his part, to carry out the contract. He stood by after full, complete and due notice, in writing, was given that the property, which he had authorized to be resold, was to be sold for $10,000, and that he would be held liable for the difference between that price and the contract price. His conduct, in view of the circumstances, was an implied acceptance of the proceedings taken. *James v. Kibler's Adm'r*, 94 Va. 165, 26 S. E. 417.

The general purpose of the law, in fixing the amount of the damages for the nonperformance of a contract, is to give such compensation as will put the plaintiff in the same position in which he would have been had the defendant kept his contract.

Under the peculiar circumstances of this case, the trial court did not err in the instructions given to the jury. There was no error in the refusal of instructions in conflict therewith. There was ample evidence, oral and written, to support a recovery for the plaintiff. The amount of the damages having been ascertained by the method authorized by the defendant, he should not be heard to complain of the method adopted. The judgment of the trial court is affirmed.

*Affirmed.*