Present: Hassell, C.J., Keenan, Koontz, Kinser, Lemons,
and Agee, JJ., and Russell, S.J.

GEORGE B. LITTLE, INDIVIDUALLY AND
AS TRUSTEE FOR THE GENERAL PARTNER OF
FOX REST ASSOCIATES, L.P., ET AL.

v.  Record No. 062504  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        November 2, 2007
MARK P. COOKE, ET AL.

FROM THE CIRCUIT COURT OF HENRICO COUNTY
Gary A. Hicks, Judge


This dispute arose out of the sale of an apartment
complex located in Henrico County known as Fox Rest
Apartments (Fox Rest), which was the sole asset of a
partnership named Fox Rest Associates, L.P. (Partnership).
Some of the Partnership's limited partners filed a
derivative suit on behalf of the Partnership pursuant to
Code § 50-73.62 and sought monetary damages against George
B. Little, individually and as trustee for the general
partner of Fox Rest, and George B. Little & Associates,
P.C., a Virginia professional corporation (collectively,
Defendants).[1]  In their motion for judgment, the Limited

---

[1] The limited partners who filed the derivative suit
were Mark P. Cooke, Alicia Hartley, Lisa Ruffin Harrison,
Ned Ruffin, Sarah Ruffin, and Harrison Ruffin (Limited
Partners).  They represented two-thirds of the ownership
interests in the Partnership.

The Frances M. Cargill Irrevocable Trust (Cargill
Trust) was the general partner of Fox Rest when the Limited
Partners filed the derivative suit.  The Cargill Trust was

Partners asserted, among other things, counts for breach of fiduciary duty and legal malpractice.

After a bench trial, the circuit court held that Little breached not only the standard of care applicable to attorneys in his role as the attorney for the Partnership but also his fiduciary duties while performing the tasks and responsibilities of the Partnership's general partner. The circuit court awarded damages to the Partnership against the Defendants, jointly and severally, in the total amount of $3,161,258.32, plus prejudgment interest. The majority of the damages comprised what the circuit court referred to as "tax damages." The circuit court also awarded attorneys' fees and costs to the Limited Partners individually, in addition to the other damages.

We awarded the Defendants this appeal on five assignments of error.[2] In the first assignment of error, the Defendants challenge the award of "tax damages" on four separate grounds: (a) the Partnership's general partner did not have the authority or duty to make a tax-free exchange

_____

subsequently added as a party defendant pursuant to an order of the circuit court.

[2] The Defendants do not challenge several of the circuit court's holdings. Notably, they do not assign error to the circuit court's conclusion that Little committed legal malpractice and breached his fiduciary duties. They also do not contest some of the categories of damages awarded by the circuit court.

2

when selling Fox Rest; (b) "tax damages" are not damages to the Partnership and thus are not recoverable in a derivative action; (c) the Limited Partners did not establish that Little's conduct proximately caused their damages; and (d) the Limited Partners failed to mitigate their damages.  In the four remaining assignments of error, the Defendants contest: (1) the circuit court's award of $400,000 for "wrongfully retained funds" from the sale of Fox Rest; (2) the award of $17,951.32 for over-charges in Little's legal bills to the Partnership; (3) the award of punitive damages in the amount of $175,000; and (4) the award of attorneys' fees to the Limited Partners in addition to the other damages awarded rather than an award of attorneys' fees from the "common fund" recovered for the Partnership.

We also awarded an appeal on the Limited Partners' two assignments of cross-error.  The Limited Partners assert that the circuit court erred either by refusing to award an additional $2,050,000 in damages against the Defendants or by failing to award at least a sum representing "the difference between the appraised market value [of Fox Rest] and sale price on the date of sale."

3

For the reasons explained hereinafter, we will affirm in part and reverse in part the judgment of the circuit court.

## I. RELEVANT PROCEEDINGS AND FACTS[3]

In accordance with established principles of appellate review, we state the facts in the light most favorable to the Limited Partners, the prevailing party in the trial court. Nusbaum v. Berlin, 273 Va. 385, 407, 641 S.E.2d 494, 506 (2007). We also accord the Limited Partners "the benefit of all reasonable inferences fairly deducible from the evidence." Id. (citing Viney v. Commonwealth, 269 Va. 296, 299, 609 S.E.2d 26, 28 (2005)); see also Xspedius Mgmt. Co. of Va., L.L.C. v. Stephan, 269 Va. 421, 425, 611 S.E.2d 385, 387 (2005). Since the circuit court heard the evidence ore tenus, its factual findings are entitled to the same weight as a jury verdict. W.S. Carnes, Inc. v. Board of Supervisors, 252 Va. 377, 385, 478 S.E.2d 295, 301 (1996) (citing RF&P Corp. v. Little, 247 Va. 309, 319, 440 S.E.2d 908, 915 (1994)). We are bound by those factual findings unless they are plainly wrong or without evidence

_____

[3] We will recite only those facts that are relevant to the issues before us in this appeal. We also will summarize additional facts as we address particular assignments of error and the assignments of cross-error.

to support them.  Code § 8.01-680; <u>Ravenwood Towers, Inc.</u>

<u>v. Woodyard</u>, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992).

As set forth in the "AGREEMENT OF LIMITED PARTNERSHIP OF FOX REST ASSOCIATES" (Partnership Agreement), the Partnership was formed in 1981 "solely for the purpose of acquiring" Fox Rest and "investing in, holding, maintaining, operating, improving, leasing, selling and otherwise using such property."  At all times relevant to this litigation, the Cargill Trust served as the Partnership's sole general partner, and Little was the trustee of the Cargill Trust.[4]  Little and his professional corporation provided legal services to the Partnership.

According to the Partnership Agreement, the general partner had "full authority and responsibility to manage, direct and control all of the affairs and business of the Partnership."  Among the powers granted to the general

---

[4] At the time the Partnership was formed, the general partner was the E. Eugene Cooke Trust (Cooke Trust), with Little serving as its trustee.  Because of a dispute concerning the Cooke Trust, Little eventually resigned as its trustee.  In 1991, Little substituted the Cargill Trust in the place of the Cooke Trust as the Partnership's general partner.  Thus, Little continued in his role as trustee for the trust serving as the Partnership's general partner.  Although Little was not technically the Partnership's general partner, he explained that, from the time the Partnership was formed, it was understood by the Cooke Trust and later by the Cargill Trust that Little would control and operate the Partnership.

partner was the authority to "dispose of any properties or assets of the Partnership including . . . Fox Rest." The Partnership Agreement directed that the Partnership be dissolved when, among other things, the general partner was removed or substantially all the Partnership's property was sold.

Little admitted that the Partnership Agreement, which he drafted, allowed him to hire himself "for whatever [he] wanted to do." The circuit court concluded that Little, "[a]cting for the [g]eneral [p]artner, . . . hired himself to perform virtually every duty of the [g]eneral [p]artner, and billed the Partnership accordingly at his hourly rates."[5] The court further concluded that Little, "[a]cting under duties he thus delegated to himself from the [g]eneral [p]artner, . . . hired himself and his law firm to provide legal services and advice to himself as the acting [g]eneral [p]artner."[6]

In the first half of 2002, Little received two separate offers to purchase Fox Rest, but he declined both offers. Later in the year, however, Little changed his

---

[5] Pursuant to the terms of the Partnership Agreement, the general partner itself did not receive compensation for services rendered to the Partnership.

[6] The Defendants do not challenge these findings on appeal.

mind.  In September 2002, Little received a letter from Edmund S. Ruffin, Jr. (Ruffin), on behalf of "the Ruffin and Cooke family members that [were] limited partners" in the Partnership.  Ruffin requested that Little consent to the substitution of a new general partner for the Partnership in the place of the Cargill Trust.

Little testified at trial that this letter "scared [him] to death" because he believed that, if he did not agree to the proposed course of action, the general partner would be removed, thereby effecting dissolution of the Partnership according to the terms of the Partnership Agreement.  Dissolution would trigger a sale of the property "under the hammer" which, according to Little, "puts the seller in a very weak position."  Believing that the proposed changes would not be beneficial to the Partnership but that a sale of the property would be in the best interests of the Partnership's investors, Little decided to sell Fox Rest.[7]  After making that decision, Little reviewed the Partnership Agreement and concluded that he, acting alone, had the authority to sell Fox Rest. Little, however, believed that he did not have the

---

[7] The Partnership's investors were the Limited Partners, other limited partners who did not join in bringing this derivative suit, and the general partner.

authority under the terms of the Partnership Agreement to engage in a "tax-free exchange" because, in his view, the Partnership "was a sole project partnership."[8]

In a letter dated October 14, 2002, Ruffin again requested Little to cooperate in the substitution of a new general partner for the Partnership, as Little had not responded to the first correspondence. Little admitted that he did not answer the first letter because he was trying to sell Fox Rest before the general partner, i.e., Little, was removed. Two days later, in correspondence dated October 16, 2002, Little advised the Partnership's investors that, "[p]ursuant to the powers conferred in the original Partnership Agreement, [he,] as [g]eneral [p]artner[, had] committed to the sale of the entire complex for a gross sales price of $10,250,000.00." Little also told the investors that settlement would occur in January 2003 and that they would incur capital gains taxes on the transaction. In response, Ruffin voiced his concern about Little's unilateral decision to sell Fox Rest within weeks after being asked to "step down as general partner."

---

[8] Pursuant to the I.R.C. § 1031, a "tax-free exchange" is designed "to defer recognition of gain or loss when a direct exchange of property between the taxpayer and another party takes place." Bell Lines, Inc. v. United States, 480 F.2d 710, 713 (4th Cir. 1973) (citation omitted).

The closing on the sale of Fox Rest took place on January 30, 2003 and the Limited Partners subsequently filed this derivative suit on behalf of the Partnership. After a multi-day bench trial, the circuit court concluded, based on expert testimony, that Little committed numerous acts of legal malpractice and breaches of fiduciary duties. In a letter opinion, the court stated:

> At a minimum, Little breached his duties as a lawyer to reasonably communicate with the Limited Partners, to refrain from self-dealing, and to make adequate disclosure of material facts to the Limited Partners. He also erred in failing to consider or inform the Limited Partners of the possibility of a tax-free exchange of Fox Rest as an alternative to an outright sale, and wrongly sold Fox Rest without properly informing himself of the Property's geographic marketability or time frame for marketing the Property.

The circuit court further concluded that many of the acts of legal malpractice also constituted breaches of Little's fiduciary duties. Continuing, the court found that Little breached his duty of loyalty and acted to further his own interests, instead of the Partnership's, by taking a substantial commission for the sale of Fox Rest, by retaining sale proceeds for the purpose of defending potential litigation, and by contracting to sell Fox Rest "in a hurried fashion without disclosing the business of the Partnership to the Limited Partners." As previously

9

stated, the Defendants do not contest any of these findings on appeal.

With regard to the five categories of damages challenged on appeal, the circuit court made the following holdings:

A. Based on several provisions of the Partnership Agreement, the circuit court concluded that Little had the authority to conduct a tax-free exchange of Fox Rest and that Little's "failure to consider its availability and advise the Limited Partners accordingly deviated from the standard of care" as an attorney and breached his fiduciary duties.[9]  The circuit court awarded the sum of $2,294,557 as "tax damages" caused by Little's failure to advise about a tax-free exchange.  The court based its award on testimony of the Limited Partners' witness who qualified as an expert in accounting matters related to partnerships, tax-free exchanges, and taxation.  The expert explained that he arrived at the figure by estimating the total tax consequences incurred by the Partnership's investors as a result of the sale of Fox Rest even though he did not have

---

[9] Early in the proceedings, the Defendants filed a demurrer stating that the Partnership Agreement did not permit Little to conduct a tax-free exchange. Additionally, the Defendants asserted that the Partnership did not have tax liability under I.R.C. § 701 and therefore

accurate tax information from all the Partnership's investors. He stated that if a tax-free exchange had been completed, the taxes would not have been owed by the individual investors. However, since that did not occur, the expert opined that the Partnership was damaged "by taking an asset and reducing its value by the taxes that were paid from the sale."

B. The circuit court awarded the sum of $400,000 to compensate for funds Little "wrongfully withheld for indemnity purposes." When Little forwarded the proceeds of the sale to the investors, he advised them in a letter dated February 4, 2003 that he was withholding approximately $300,000 to $400,000 "to cover litigation expenses" if any of the Partnership's investors pursued legal action regarding the sale of Fox Rest. The circuit court concluded that withholding $400,000 "for a potential lawsuit . . . fell below the standard of care."

C. The circuit court awarded the sum of $17,951.32 to compensate for the amount Little over-charged on legal bills to the Partnership on various occasions. The over-charging occurred when Little billed the Partnership for an amount greater than the product obtained by multiplying

the Partnership was not harmed by the sale of Fox Rest. The circuit court denied the demurrer.

11

Little's hourly rate by the number of hours of work itemized on a bill.  Little stated that he increased his legal fees in some instances because, in his opinion, the legal services rendered to his client were more valuable than the amount reflected by merely multiplying the number of hours expended by his hourly rate.  The circuit court concluded that Little's over-charging fell below the standard of care for an attorney because the Limited Partners never saw the bills and thus were not in a position to question any erroneous charges.

D. The circuit court awarded the sum of $175,000 in punitive damages.  The court concluded that punitive damages were warranted because of Little's "wrongful billing," which, according to the court, constituted " 'misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of another.' "  (Quoting Cardinal Holding Co. v. Deal, 258 Va. 623, 633, 522 S.E.2d 614, 620 (1999)).  According to the circuit court, the wrongful billing consisted of Little's overcharging his client, withholding monies for himself that belonged to the Partnership, unilaterally altering his billing procedures without first informing his client, and taking " 'commissions' " and " 'premiums' " for

12

work already charged at an hourly rate, thereby " 'double billing' " his client.

E. Pursuant to Code § 50-73.65, the circuit court awarded the Limited Partners their reasonable attorneys' fees in the amount of $577,691 and costs in the amount of $152,874.76.  The court reasoned that an award of attorneys' fees was "justified under the 'common fund' exception to the American Rule" due to the Limited Partners' success in the derivative action.  According to the circuit court, the award of attorneys' fees and costs was to be "added on" to the total amount of damages otherwise awarded.  The court further explained that it awarded the attorneys' fees and costs to the Limited Partners individually, but that it awarded all the other damages to the Partnership, not to the Limited Partners, since they brought this case as a derivative suit on behalf of the Partnership.[10]

---

[10] The circuit court awarded two additional categories of damages that the Defendants do not challenge on appeal. The first award was in the amount of $90,000 and represented two premiums of $45,000 each that Little charged the Partnership for services performed as a "mortgage broker" when he obtained two separate refinancing loans for the Partnership.  According to the circuit court, each charge of $45,000 was a premium because Little also billed for the same work at his hourly rate.  The court concluded that billing twice for the same work fell below the standard of care for an attorney.

13

II. ANALYSIS

We will address the Defendants' assignments of error challenging several of the circuit court's damage awards in the order previously set forth. We will then decide the Limited Partners' assignments of cross-error.

A. Tax Damages

In the first assignment of error, the Defendants challenge the circuit court's award of "tax damages" on four separate grounds. To resolve this assignment of error, however, we need only address the question whether the tax consequences incurred by the Partnership's investors as a result of the sale of Fox Rest were damages to the Partnership that can be recovered in this derivative suit.

With regard to this issue, the Defendants first point out that the "tax damages" awarded by the circuit court represented the estimated collective income tax liability

_____

The other award of damages was in the amount of $358,750 and represented the commission Little paid himself in connection with the sale of Fox Rest. The circuit court concluded that taking this commission also fell below the standard of care for an attorney because Little billed the Partnership at his hourly rate for the same sale.
Although the Cargill Trust was a named defendant, the circuit court did not award any damages against the trust. The court stated that "none of the damages awarded, and none of the attorneys' fees and costs to be awarded, are imposed against the Frances M. Cargill Irrevocable Trust, and no judgment is rendered against it."

incurred by the Partnership's investors as a result of the sale of Fox Rest. Thus, the "tax damages," according to the Defendants, were not damages sustained by the Partnership since it, like any partnership, does not pay taxes. Instead, the tax consequences of selling Fox Rest represented damages to all the Partnership's investors, which include the Limited Partners. For that reason, the Defendants argue that the "tax damages" cannot be recovered in this derivative suit since the purpose of such a suit is to recover those damages actually suffered by the Partnership.

The provisions of Code § 50-73.62 permit "[a] limited partner [to] bring an action in the right of a limited partnership to recover a judgment in its favor to the same extent that a stockholder may bring an action for a derivative suit under the Stock Corporation Act." "A derivative action is an equitable proceeding in which a shareholder asserts, on behalf of the corporation, a claim that belongs to the corporation rather than the shareholder." Simmons v. Miller, 261 Va. 561, 573, 544 S.E.2d 666, 674 (2001); see also Bernstein v. Levenson, 437 F.2d 756, 757 (4th Cir. 1971) ("In a stockholders' derivative action the corporation, not the complaining shareholder, is the real party in interest.").

The circuit court correctly explained that, in the context of a corporate derivative suit, "the corporation must have suffered an actual injury for there to be grounds for a shareholder's derivative suit, and . . . the only damages recoverable in a derivative suit are those related to the loss or damage proximately caused by the wrong committed." (citing Michaud v. Morris, 603 So. 2d 886, 887 (Ala. 1992)).  See also Mount v. Radford Trust Co., 93 Va. 427, 431, 25 S.E. 244, 245 (1896) ("[A stockholder] may commence the suit, and may prosecute it to judgment; but in every other respect the action is the ordinary one brought by the corporation.  It is maintained directly for the benefit of the corporation, and the final relief, when obtained, belongs to the corporation, and not to the stockholder plaintiff." (citation omitted)); Brown v. Bedford City Land & Improvement Co., 91 Va. 31, 37, 20 S.E. 968, 970 (1895) (stating that a stockholder may institute a suit for the benefit of the corporation to remedy corporate directors' wrongdoing); 13 William Mead Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 6028, at 281 (perm ed., rev. vol. 2004) ("Any recovery in a derivative proceeding generally belongs to the corporation and not to the plaintiff or other shareholders. Relief cannot be granted to the corporation unless the

16

action is derivative."); id. § 6038, at 296 ("A shareholder in a derivative proceeding may obtain monetary damages, although any recovery belongs to the corporation and not the shareholder.").

The same principles apply in the context of a derivative suit filed on behalf of a limited partnership. See Strain v. Seven Hills Assocs., 429 N.Y.S.2d 424, 432 (N.Y. App. Div. 1980) ("[A] limited partner's power to vindicate a wrong done to the limited partnership and to enforce redress for the loss or diminution in value of his interest is no greater than that of a stockholder of a corporation."). The claim asserted in the suit belongs to the limited partnership, not to the limited partners, and the limited partnership itself must have sustained injury. Any recovery belongs to the limited partnership.

The Limited Partners do not challenge these principles. They, however, argue that the value of the Partnership decreased by virtue of the sale of Fox Rest. In their words, "the 'tax damages' were computed as a surrogate for the loss of the value of the [P]artnership as an investment vehicle." To support their argument, the Limited Partners point to the testimony of their own accounting expert as well as that of the Defendants' witness who qualified as an expert in the field of

certified public accounting and partnership taxation.  The Limited Partners' expert opined that the Partnership was damaged because the value of its asset was reduced "by the taxes that were paid from the sale."  Similarly, the Defendants' expert witness answered affirmatively when asked if the value of an investment vehicle declines when its only asset is converted to cash and then part of the cash has to be distributed to pay taxes.  According to the Limited Partners, the diminution in value would not have occurred if Little either had not sold Fox Rest or had effected a tax-free exchange.  We do not agree with the Limited Partners' position for several reasons.

Their argument overlooks the legal posture of a limited partnership with regard to income tax liability. The Partnership's investors – not the Partnership – incurred whatever income tax liability resulted from the sale of Fox Rest.  See I.R.C. § 701 ("A partnership as such shall not be subject to the income tax imposed by this chapter.  Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities."); see also Littriello v. United States, 484 F.3d 372, 375 (6th Cir. 2007) (explaining that partnership income is taxed "not at the business level but only after it passes through to the individual partners and is taxed

18

as income to them, pursuant to I.R.C. [§ 701]"); cf.

Bufferd v. Commissioner, 506 U.S. 523, 525 (1993)

(describing an S-corporation as having "a pass-through

system under which corporate income, losses, deductions,

and credits are attributed to the individual shareholders

in a manner akin to the tax treatment of partnerships").

The circuit court therefore erred in its assessment of

"damages to the Partnership . . . relating to any tax

consequences attributed to the Partnership."  There were no

tax consequences attributable to the Partnership.

The Limited Partners nevertheless argue that the sale

of Fox Rest converted the Partnership's sole asset to cash

and that the value of the Partnership decreased when that

cash had to be distributed to pay the Limited Partners' and

other investors' income tax liabilities.  The sale of Fox

Rest did convert the Partnership's asset to cash, but, at

that moment in time, the value of the Partnership's asset

was the same as before the sale; it did not diminish in

value.  The sale just changed the nature of the

Partnership's asset.

Furthermore, the Limited Partners' assertion that cash

had to be distributed to pay the investors' income tax

liabilities resulting from the sale of Fox Rest is not

supported by the terms of the Partnership Agreement.  Any

revenues of the Partnership not required to meet its obligations and to conduct future operations were to be distributed to the investors on a quarterly basis. Upon dissolution of the Partnership, its assets were to be distributed in cash or in kind in proportion to each partner's capital account as adjusted according to a formula set forth in the Partnership Agreement. No provision in the Partnership Agreement required a distribution of cash to pay income taxes owed by the Partnership's investors as a result of the Partnership's business activities.

There is also no merit in the Limited Partners' argument that the "tax damages" were a proper measure of damages in this case because legal "malpractice damages are calculated on the basis of the value of what is lost by the client which in many cases will be measured by tax consequences." Contrary to the Limited Partners' argument, our decision in Rutter v. Jones, Blechman, Woltz & Kelly, P.C., 264 Va. 310, 568 S.E.2d 693 (2002), does not support their position. In Rutter, the dispositive issue involved "the ability of an executor to bring an action for legal malpractice in connection with the preparation of testamentary documents." Id. at 313, 568 S.E.2d at 694. The Court determined that the alleged damages, additional

tax assessed against the estate and additional legal and accounting fees, did not arise until after the death of the testatrix.  Id. at 314, 568 S.E.2d at 695.  Thus, the cause of action asserted by the executor was not one that could have been raised by the testatrix during her lifetime and therefore did not survive her death.  Id.  Our decision did not address the type of damages recoverable in a derivative suit involving a claim for legal malpractice.

In sum, we conclude that the circuit court erred by awarding "tax damages" against the Defendants.  Such damages were not sustained by the Partnership and thus were not recoverable in this derivative suit.  Cf. Golden Tee, Inc. v. Venture Golf Schools, Inc., 969 S.W.2d 625, 628–29 (Ark. 1998) (requiring a limited partner who is alleging indirect damage to himself based on a decrease in the value of the limited partnership to bring a derivative claim) (relying on Kenworthy v. Hargrove, 855 F. Supp. 101, 106 (E.D. Pa. 1994) ("When a limited partner alleges wrongs to the limited partnership that indirectly damaged a limited partner by rendering his contribution or interest in the limited partnership valueless, the limited partner is required to bring his claim derivatively on behalf of the partnership.")).

B. Wrongfully Withheld Funds

The Defendants challenge the circuit court's award of $400,000 for funds Little did not distribute from the Partnership but wrongfully withheld for indemnity purposes on the basis that the award was contrary to the evidence presented at trial. The Defendants point to Little's testimony that he withheld only the sum of $350,000, that he paid legitimate Partnership expenses and debts out of the withheld funds leaving a balance of $284,000, and that he should pay back approximately $20,000 that he expended for his legal fees. Thus, according to the Defendants, the circuit court's award should be reduced to the amount of $304,000.

The relevant evidence regarding this issue is found in Little's testimony. The following exchange occurred during his direct examination:

> Q [Counsel for Little] And in this letter did you tell them that you were withholding between $300,000 and $400,000 from that distribution?
>
> A [Little] Right. I did.
>
> . . . .
>
> Q Now, in terms of how much was actually withheld, do you have an approximate amount as to how much was actually withheld?
>
> A I first told them I thought just picking a figure out of the air, we hadn't gotten all the bills in, I thought it was going to be between $300,000 and $400,000. I think it came out at 350.

22

Q  With respect to that $350,000, Mr. Little, how much is still held today in the partnership account?

A  $284,000 and some change.

. . . .

Q  And did the partnership also have additional bills to pay –

A  Yes.

Q  – after the closing?

A  Right.

. . . .

Q  Tell me about the payments.  Tell me about the payments that came out of the account.

A  I think we paid accounting fees.  And the legal fees, I know I took some out for my legal fees thinking I had a right to do it.  I paid you some fees.

. . . .

Q  What were those fees for?

A  I thought they were for the services you rendered when the same plaintiffs filed the second suit that's pending.

Q  Not in connection with this lawsuit?

A  No, no, no.  Not this one.  But then on my payments I charged, I don't know, $20,000 worth of fees to the account.

Q  Do you think that was wrong?

A  That's wrong now.

Q  And that you should have to reimburse that?

23

A   Yes.

Q   Otherwise are you saying you believe the disbursements were legitimate disbursements?

A   Yes.

During cross-examination, Little provided the following additional testimony on this issue:

Q   [Counsel for Limited Partners] Now, at the time of the sale of this property, in addition you also held back some $350,000 to $400,000 for payment of fees.

A   [Little] Yes, I did, thinking I had the right to do it.

Q   Do you now think you have a right to do it?

A   No.

Q   So you should not have withheld any penny of that, correct?

A   I don't believe I should have[.]

. . . .

Q   Well, you have paid some of your legal fees out of that, didn't you?

A   I did, about $21,000.

"To recover damages in any case, a plaintiff must prove with reasonable certainty the amount of his damages and the cause from which they resulted." Hale v. Fawcett, 214 Va. 583, 585, 202 S.E.2d 923, 925 (1974) (citing Barnes v. Quarries, Inc., 204 Va. 414, 418, 132 S.E.2d 395, 397-98 (1963)); see also Carr v. Citizens Bank & Trust Co., 228

Va. 644, 652, 325 S.E.2d 86, 90 (1985) ("The plaintiff has the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery."). Because the circuit court's decision to award the sum of $400,000 as damages for wrongfully withheld funds was a factual issue, we will uphold its decision unless it is clearly erroneous or without evidence to support it. See Perel v. Brannan, 267 Va. 691, 698, 594 S.E.2d 899, 903 (2004) (stating that we do not disturb a trial court's factual findings "unless they are plainly wrong or without evidence to support them").

Based on Little's testimony as well as his correspondence to the Partnership's investors advising them that he was withholding approximately $300,000 to $400,000, we conclude that the circuit court's finding that Little wrongfully withheld the sum of $400,000 was clearly erroneous. At trial, Little's testimony established that he withheld only $350,000 and that the balance of $284,000 remains after paying legitimate Partnership expenses. Little also candidly admitted that he improperly used either $20,000 or $21,000 of the $350,000 to pay his own legal expenses and that he should pay back that amount.

The Limited Partners presented no evidence to refute Little's calculations as to the amount of money remaining or the legitimacy of the Partnership bills paid out of the withheld funds. Thus, we conclude that the Limited Partners did not carry their burden to prove that they were entitled to an award of $400,000 for funds wrongfully withheld. Contrary to their argument, it was not Little's burden to produce records to confirm his calculations. Also, Little's admission that he should not have withheld the funds does not change our conclusion.

Therefore, we will reverse the circuit court's judgment awarding $400,000 for wrongfully withheld funds. Based on the evidence at trial and Little's acknowledgement that he should pay back the amount expended for his legal fees, we will enter judgment against the Defendants, jointly and severally, in favor of the Partnership in the amount of $305,000.[11]

### C. Over-Charges

Little claims the circuit court erred by awarding $17,951.32 for over-charges in legal bills to the Partnership "when such damages were neither pled nor

---

[11] At trial, Little testified to the figures of $20,000 and $21,000 as the amount he expended out of the $350,000 for his legal fees. We will use the figure of $21,000

26

disclosed in any of Plaintiffs' pleadings or discovery responses (including those specifically directed to damages)." The Limited Partners counter first by claiming that the Defendants waived this issue because they did not object to the admission of their legal bills, which evidenced the $17,951.32 in over-charges. They also argue that the over-charges were prima facie evidence of Little's attorney malpractice and breach of fiduciary duties and that the circuit court could therefore award "general damages" for the over-charges. Finally, the Limited Partners claim that, since the Defendants were obviously aware of the over-charges reflected on their legal bills to the Partnership, "it is reasonable to conclude . . . that [the Defendants] were on notice that the derivative action subsumed these general damages." We agree with the Defendants and will reverse the circuit court's award of damages for the over-charges.

While the Limited Partners did allege certain over-charges by Little in their motion for judgment, such as the commission Little paid himself for the sale of Fox Rest and the premiums Little charged for the two refinancing loans, they did not allege the specific over-charges at issue.

since it represents the evidence in the light most favorable to the Limited Partners.

27

The first mention of these alleged over-charges appears to be in the Limited Partners' proposed findings of fact and conclusions of law submitted to the circuit court several days before trial.  In that pleading, the Limited Partners identified specific dates in Little's legal bills where the product derived by multiplying the hourly billing rate by the number of hours worked did not correspond to the total amount charged to the Partnership.  Yet, the Limited Partners did not ask for damages to be awarded for these particular over-charges in their proposed award of damages.

The Limited Partners did, however, specifically mention the over-charges in opening statement: "[W]e will be asking for the fee miscalculations, the $17,951 that are simple bad arithmetic errors on legal bills that nobody ever saw, but [Little] pulled the money out of the trust." In the Defendants' opening statement, they responded:

> Now, Mr. Vick [counsel for the Limited Partners]
> seemed to raise some issue about collecting on
> those bills.  Well, that's not in this case, and
> I don't know whether he's now making it a part of
> this case, but that's not part of this case.
> Never has been.  It's not in their proposed
> findings of fact [or] conclusions of law, not in
> anything, so I don't know where he's coming from
> now.

During the Limited Partners' case-in-chief, a number of Little's legal bills to the Partnership were admitted into evidence without objection.  By performing

28

mathematical calculations, it is evident that these bills reflect the over-charges at issue.  However, once it became apparent to the Defendants that the Limited Partners were using these bills to claim damages for Little's over-charges, the Defendants objected, stating that the "fees that he's talked about . . . to Mr. Little . . . are not damages sought in this case."  Moreover, at the close of the Limited Partners' case-in-chief, the Defendants moved to strike, among other things, the evidence of the over-charges stating: "[T]hat's not pled, and there really is no evidence on it; not a word about it in their damage interrogatory, nothing in their proposed findings of fact.  And we don't think that should remain as part of the case."  The circuit court overruled the motion to strike.

Subsequently, when the Limited Partners asked Little during cross-examination about the over-charges, the Defendants objected stating: "[T]here is no claim made for this.  There is nothing in the motion for judgment.  There is nothing [in] the complaint.  There is nothing in their proposed findings.  This is a claim that we are essentially hearing about for the first time now without really any opportunity to prepare for the defense."  The Defendants further stated: "[W]e asked a discovery interrogatory – damage interrogatory:  Tell us what your damages are.  Not

29

a word about this." The circuit court overruled the objection.

Based on the Defendants' arguments to the circuit court at various stages of the proceedings, we reject the Limited Partners' suggestion that the Defendants waived any objection to the damage claim for the over-charges. The circuit court clearly had several occasions to rule on the Defendants' objection. See Nusbaum, 273 Va. at 406, 641 S.E.2d at 505.

With regard to the merits of the Defendants' challenge to this award of damages, the Limited Partners, on brief, do not dispute the Defendants' assertion that the Limited Partners never identified over-charges in the amount of $17,951.32 in response to discovery requests for each component of the Limited Partners' claimed damages. Instead, they attempt to justify their failure to disclose this category of damages until shortly before trial by arguing that the Defendants were on notice that the derivative action "subsumed these general damages" since the over-charges appeared on the Defendants' legal bills.

The Limited Partners' position defeats one of the purposes of discovery, "to disclose all relevant and material evidence before trial in order that the trial may be an effective method for arriving at the truth and not 'a

battle of wits between counsel.'"  Guilford Nat'l Bank of Greensboro v. Southern R. Co., 297 F.2d 921, 924 (4th Cir. 1962) (quoting Hickman v. Taylor, 329 U.S. 495, 516 (1947)); see also Sheek v. Asia Badger, Inc., 235 F.3d 687, 693 (1st Cir. 2000) (the purpose of discovery is to narrow the issues and eliminate surprise at trial); Emerson Elec. Co. v. Superior Court, 946 P.2d 841, 844 (Ca. 1997) ("One of the principal purposes of discovery was to do away 'with the sporting theory of litigation--namely, surprise at trial.' ") (quoting Greyhound Corp. v. Superior Court, 364 P.2d 266, 275 (Ca. 1961)).  Moreover, in the face of the Defendants' repeated objections at trial to this particular claim because it was new and had not been disclosed in discovery, we conclude that the circuit court abused its discretion by awarding damages for Little's over-charges. We will therefore reverse that portion of the circuit court's judgment.

### D. Punitive Damages

The Defendants claim that the circuit court erred in awarding punitive damages on the basis that the evidence was insufficient as a matter of law to sustain such an award.  The Defendants, however, did not move to strike the evidence on punitive damages or to set aside that portion of the circuit court's judgment.  There is also no mention

of punitive damages in the Defendants' post-trial brief although the Limited Partners requested punitive damages in the amount of $350,000 in their post-trial brief.[12] The only objection by the Defendants to the award of punitive damages is found in their exceptions noted on the circuit court's final order: "The award of punitive damages is based solely on wrongful billing practice and, as such, is without any factual or legal basis as the evidence does not support a finding of malicious, willful, or wanton conduct."

Generally, the appropriate way to test the sufficiency of evidence is by a motion to strike or by a motion to set aside a verdict. See Gabbard v. Knight, 202 Va. 40, 43, 116 S.E.2d 73, 75 (1960) ("While a motion to strike is an appropriate way of testing the sufficiency of relevant evidence to sustain an adverse verdict, it is not the only way. It has long been the practice in this jurisdiction to test the sufficiency of such evidence by a motion to set aside the verdict."); see also Fortune v. Commonwealth, 14 Va. App. 225, 227, 416 S.E.2d 25, 27 (1992) ("In a trial without a jury, . . . where sufficiency of the evidence is challenged in defense counsel's closing argument it may

---

[12] Both parties submitted post-trial briefs in lieu of closing arguments.

properly be preserved for appeal."). In this case, the Defendants' did neither. They also did not oppose an award of punitive damages in their post-trial brief, nor did they ask the circuit court to reconsider its award of punitive damages. Moreover, the Defendants' bare exception noted on the final order failed to present to the circuit court their argument opposing the award of punitive damages that they now raise on appeal. Accordingly, we conclude that the Defendants did not properly preserve this issue for appeal. See Rule 5:25. The circuit court never had the opportunity to rule on the Defendants' challenge to the sufficiency of the evidence to sustain an award of punitive damages. See Nusbaum, 273 Va. at 402-03, 641 S.E.2d at 503.

Notwithstanding our holding, we will remand the award of punitive damages to the circuit court for reconsideration of the amount of the award in light of our reversal of some of the compensatory damage awards. The circuit court awarded punitive damages for Little's "wrongful billing" practices, and we are setting aside two of the components of that wrongful billing, the wrongfully withheld funds and the over-charges. See Gazette, Inc. v. Harris, 229 Va. 1, 51, 325 S.E.2d 713, 747 (1985) ("The amount of punitive damages awarded should bear some

reasonable relationship to the actual damages sustained and to the measure of punishment required."); <u>Stubbs v. Cowden</u>, 179 Va. 190, 201, 18 S.E.2d 275, 280 (1942) ("[Punitive] damages awarded should bear some reasonable proportion to the real damages sustained and to the measure of punishment required."); <u>see also</u> <u>Baldwin v. McConnell</u>, 273 Va. 650, 657–59, 643 S.E.2d 703, 706–07 (2007).

## E. Attorney's Fees

The Defendants claim that "the trial court erred by awarding Attorneys' Fees in addition to the other damages awarded, rather than award fees to the derivative suit [Limited Partners] from the 'common fund' recovered for the Partnership." We agree.

The relevant code section allowing an award of attorneys' fees and costs in a successful derivative suit filed on behalf of a limited partnership states:

> If a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise or settlement of an action or claim, except as hereinafter provided, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct him to remit to the limited partnership the remainder of those proceeds received by him. On termination of the derivative action, the court may require the plaintiff to pay any defendant's reasonable expenses, including reasonable attorney's fees, incurred in defending the action if it finds that the action was commenced without reasonable cause or the plaintiff did not fairly

and adequately represent the interests of the limited partners and the partnership in enforcing the right of the partnership.

Code § 50-73.65.

The Defendants' challenge to the award of attorneys' fees raises an issue of statutory interpretation. "Interpretation of a statute is a pure question of law subject to de novo review by this Court." Virginia Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc., 271 Va. 304, 309, 626 S.E.2d 436, 438 (2006) (citing Ainslie v. Inman, 265 Va. 347, 352, 577 S.E.2d 246, 248 (2003)). We find this statute to be clear and unambiguous. We must, therefore, give the statute its plain meaning. See HCA Health Servs. of Va., Inc. v. Levin, 260 Va. 215, 220, 530 S.E.2d 417, 419-20 (2000).

The operative language of Code § 50-73.65 is found in the first sentence directing a successful plaintiff who has received an award of reasonable attorneys' fees and expenses "to remit to the limited partnership the remainder of those proceeds received by him." Code § 50-73.65. The General Assembly's use of the word "remainder" indicates its intent for the award of reasonable attorneys' fees and expenses to be subtracted from the total amount "received by the plaintiff as a result of a judgment, compromise or

35

settlement of an action or claim," with the "remainder" being remitted to the limited partnership.  Id.

Our view of the statute is consistent with what is known as the "common fund" exception to the "American Rule" prohibiting the shifting of attorneys' fees to the losing party.  See Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991) (discussing the "common fund exception" as based on a court's "historic equity jurisdiction . . . [that] allows a court to award attorney's fees to a party whose litigation efforts directly benefit others").  "[Whoever] recovers a common fund for the benefit of persons other than himself . . . is entitled to a reasonable attorney's fee from the fund as a whole."  Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980); see also Mardel Sec., Inc. v. Alexandria Gazette Corp., 278 F. Supp. 1010, 1017–18 (E.D. Va. 1967) ("[A]ttorneys' fees constitute an incident to the claim [in a stockholder's derivative action] and are payable out of the fund recovered.").

Thus, we conclude that the circuit court erred by awarding reasonable attorneys' fees and expenses in addition to the other damages awarded to the Partnership. Instead, in accordance with the requirements of Code § 50–73.65, the award of attorneys' fees and expenses must be paid from the "common fund" received by the Limited

Partners on behalf of the Partnership and the remainder remitted to the Partnership. We are not persuaded otherwise by the Limited Partners' reliance on the second sentence of the statute allowing an award of attorneys' fees to a defendant if the "action was commenced without reasonable cause or the plaintiff did not fairly and adequately represent the interests of the limited partners and the partnership in enforcing the right of the partnership." Id. Obviously, in the latter situation, there would not be a "common fund" from which to deduct the award of attorneys' fees to a defendant. That fact does not negate the clear intent of the General Assembly as expressed in the first sentence of the statute.

### F. Cross-Error

At trial, the Limited Partners presented expert testimony establishing the fair market value of Fox Rest on the closing date of the sale, January 30, 2003, and on a date shortly before trial, June 30, 2005, to be $11,400,000 and $12,300,000, respectively. The circuit court, however, refused to award additional damages to the Limited Partners based on either of these valuations. Although the circuit court concluded that Little committed legal malpractice and breached his fiduciary duties by entering into a contract to sell Fox Rest only

37

34 days after deciding to sell the property "in the face of a challenge to his authority" and by marketing the property to only two potential buyers, it nevertheless found that "the damages relating to the hurried aspect of the sale of Fox Rest are too speculative."  In its letter opinion, the court stated:

> The [c]ourt cannot award damages relating to the value of Fox Rest at the time of the hurried sale because the [c]ourt cannot determine the amount of damages. . . . The [c]ourt finds that the [Limited Partners] had the burden of proving what the property was worth as of the date the contract of sale was entered into.  The [Limited Partners] did not meet their burden; therefore, damages pertaining to the value of Fox Rest at the date of sale are too speculative to award.

The Limited Partners assign cross-error "to the circuit court's refusal to award an additional $2,050,000 in damages . . . resulting from the sale of Fox Rest . . . given that these damages were non-speculative and were actually incurred by the . . . Partnership." Alternatively, if this Court does not grant relief on the first assignment of cross-error, the Limited Partners, in their second assignment of cross-error, assert that "the circuit court should have at least awarded the difference between the appraised market value and sale price on the date of sale, which defendants argued below is a proper measure of sale-related damages."

Although the Limited Partners challenge the circuit court's conclusion that their proof of damages was too speculative, their assignments of cross-error do not contest the circuit court's holding that "the [Limited Partners] had the burden of proving what the property was worth as of the date the contract of sale was entered into." Thus, that holding is the law of the case, see Landmark Communications, Inc. v. Macione, 230 Va. 137, 140, 334 S.E.2d 587, 589 (1985), and means that Little's breach of the standard of care as an attorney and of fiduciary duties occurred when he executed the contract to sell Fox Rest.

"[G]enerally the measure of [plaintiff's] damages is the difference between the contract price and the [saleable] or market value of the property at the time of the breach." Definite Contract Bldg. & Loan Ass'n v. Tumin, 158 Va. 771, 784, 164 S.E. 562, 566 (1932); see also Barr v. MacGlothlin, 176 Va. 474, 482, 11 S.E.2d 617, 620 (1940) ("The general rule is that where there is a breach by the vendee of an executory agreement to purchase land and a subsequent resale, either public or private, by the vendor, the measure of damages ordinarily is the difference between the contract price and the saleable or market value at the time of the breach.")

(emphasis added); <u>Webster v. Di Trapano</u>, 494 N.Y.S.2d 550, 551 (N.Y. App. Div. 1985) ("[T]he proper measure of damages is the difference between the contract price and the market value of the real property at the time of breach."); <u>First Methodist Episcopal Church of Strong City v. North</u>, 140 P. 888, 889 (Kan. 1914) (finding the measure of damages for the sale of property to be "the difference between the contract price and the [saleable] or market value at the time of the breach"). The Limited Partners offered no proof to establish that the fair market value of Fox Rest on the date of breach, October 16, 2002, when Little entered into a contract to sell Fox Rest for $10,250,000, exceeded the contract price. The fair market value of Fox Rest on either January 30, 2003 or June 30, 2005 was irrelevant and did not establish any damages on the date of breach. Therefore, we conclude that the circuit court's judgment refusing to award damages for the hurried sale of Fox Rest based on either of the Limited Partners' valuations was not plainly wrong or without evidence to support it.[13]

---

[13] The Limited Partners also argue that the value of Fox Rest would have continued to appreciate if the sale had not occurred and that they were therefore entitled to damages based on the June 30, 2005 fair market value. That argument presumes that the circuit court found that the fact of the sale constituted legal malpractice and a breach

III. CONCLUSION

For the reasons stated, we will reverse the portions of the circuit court's judgment awarding "tax damages" in the amount of $2,294,557 and awarding damages for over-charges in the amount of $17,951.32. We will also reverse the part of the circuit court's judgment awarding the sum of $400,000 for wrongfully withheld funds but enter judgment against the Defendants, jointly and severally, in the amount of $305,000. Continuing, we will affirm the portion of the circuit court's judgment awarding punitive damages but remand for recalculation of the amount of those damages in accordance with this opinion. We will reverse the portion of the circuit court's judgment awarding attorneys' fees and expenses <u>in addition to</u> the other damages awarded to the Partnership and direct that the award of attorneys' fees and expenses be paid from the "common fund" awarded to the Partnership. Finally, we will affirm that part of the circuit court's judgment refusing to award additional damages for the hurried sale of Fox Rest.

<u>Affirmed in part</u>,
<u>reversed in part</u>,
<u>and remanded</u>.

---

of fiduciary duties. According to the circuit court, the legal malpractice and breach of fiduciary duties, however, arose from the hurried aspect of the sale.