EDSEL ADAMS, ET AL.

V.

RUBY REYNOLDS ADAMS, ET AL.

Record No. 840565

June 12, 1987

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell, and Thomas, JJ., and
Cochran, Retired Justice

*G. Carter Greer (T. Keiser Greer; Greer & Greer*, on brief), for appellants.

*Ronald W. Williams; Theodore P. Huggins (Warren, Parker, Williams, Stilwell and Morrison*, on brief), for appellees.

POFF, J., delivered the opinion of the Court.

This is an appeal from a decree denying a prayer for specific performance of an alleged oral promise to devise a moiety in a tobacco farm.

The farm, formerly owned by Miss Kate Nunnelee (Miss Kate), passed under her will to C. F. Adams (C.F.) and, under his will, to his widow, Ruby Reynolds Adams. C. F. Adams, Jr., and Franklin R. Adams, C.F.'s sons, qualified as executors of their father's estate. Edsel Adams,[1] C.F.'s first cousin, and his wife Clara (the complainants) filed a bill of complaint against C.F.'s widow and the executors of his estate. In support of their prayer for specific performance, the complainants alleged that, pursuant to an oral contract with C.F., they had moved into Miss Kate's home and cared for her until her final illness and that, in breach of one of the terms of that contract, C.F. had failed to devise a half interest in the Nunnelee farm to them. The respondents denied that "any contract existed . . . concerning any purported promise to devise one-half of the Nunnelee farm to the Complainants", and the cause was tried to a jury on an issue out of chancery.

The evidence shows that Miss Kate had entrusted the management of her business affairs to C.F. while she was living with her sister in Portsmouth. Her sister died in September 1960, and Miss Kate, who was then 82 years of age, decided to move into the residence located on her tobacco farm. In 1957, C.F. had engaged Edsel to lease the tobacco rights on her farm. According to custom, Edsel received three-fourths and the farm owner one-fourth of the net farm revenues. Edsel and Clara were living with their three children in a modest house owned by Clara's father. C.F. asked Edsel and Clara if they would be willing to move into the Nunnelee house and care for Miss Kate. Edsel testified that C.F. told him that he (C.F.) would acquire title to the Nunnelee farm under Miss Kate's will and he "would give us half of the farm at his death, but we would start receiving at her death, as if half of the farm was ours." To the same effect, Clara testified that, "after Miss Kate's death, we would start sharing in the farm, as if we owned half, and at his death, he would leave us half of the farm."

The parties reached an oral agreement, and C.F. had the farmhouse converted into two apartments, each equipped with modern conveniences. In the spring of 1961, Miss Kate occupied the upstairs unit and Edsel and his family moved into the downstairs apartment. At that time and for the next five years, Clara was employed in a textile mill in Danville, and Edsel was tending the

---

[1] Edsel Adams died while this appeal was pending, but this does not abate the appeal. Code § 8.01-20.

farm and working part time in C.F.'s store located nearby. Yet, the evidence showed that Miss Kate was never left alone in the house at night.

In November 1966, Miss Kate entered a nursing home. She returned to her apartment in April 1967 where she lived until she was hospitalized with a stroke in January 1969. She died in April of that year. The evidence is uncontradicted that, following Miss Kate's return from the nursing home, she required close supervision, that she was unable to bathe herself or to perform her bodily functions without assistance, and that Edsel and Clara were faithful in ministering to her needs.

By her will, Miss Kate devised her farm to C.F. and, following her death in 1969, C.F. shared half of his portion of net farm revenues with Edsel and Clara, and Clara paid half the real estate taxes on the farm. C.F. decided that year to sell his home and his store and move to Danville. In a deposition, excerpts of which were read to the jury, Edsel testified that C.F. "sold me the store and the house, and the four acres of land, and he financed the whole works . . . [at] [s]ix and one-half percent". The purchase price was $28,000. In September 1970 after Edsel's family had moved into their new home, C.F. sold the Nunnelee house and the lot on which it sat and gave Edsel a check for $5,000, representing half the proceeds of the sale.

C.F. died from injuries sustained in an automobile accident in August 1980. By his will dated August 11, 1961, he devised his entire estate to his widow. Attached by a rubber band to the will was a letter of instructions addressed to her and to his two sons. The handwritten letter, dated February 17, 1980, provided in part:

The Nunnelee farm I would offer to Edsel Adams at the price I have listed; I told he and Clara I would suggest you sell them the farm at a reasonable price. But this is just a suggestion.

The chancellor submitted the cause to the jury on a verdict form containing three typewritten interrogatories. The jury was asked to answer, first, whether "there [was] clear and convincing evidence of the existence of any oral agreement"; second, "what were the terms of any such agreement"; and, third, whether the complainants had performed "so much of their part of [any such]

agreement . . . that refusal of full execution of the agreement would operate as a fraud upon them."

The jury answered the first interrogatory in the affirmative. In response to the second, the jury detailed the terms of the agreement in handwriting. The jurors found that the parties had agreed that, in consideration of the complainants' services in caring for Miss Kate and working her farm, the complainants would receive half of C.F.'s portion of net farm revenues and pay half the real estate taxes accruing after her death; that after her death, "the profits from the sale of [her] house [would] be divided equally between [the complainants and C.F.]"; and, at C.F.'s death, that "the Nunnelee farm [would] be offered to Clara and Edsel Adams, at fair market value; if Mrs. Ruby Adams desired to sell the farm." The jury's answer to the third interrogatory was in the negative.

The chancellor adopted the jury's findings of fact and entered a final decree dismissing the bill of complaint. We granted Edsel and Clara an appeal to consider the several questions raised by their assignments of error.

The complainants contend that the chancellor erred in admitting evidence of C.F.'s reputation for integrity and veracity. On cross-examination of the complainants' son, counsel for the respondents asked the witness if C.F. had not enjoyed "a reputation in the community of being a very honorable man" and a good reputation "about telling the truth". The witness answered in the affirmative. The chancellor ruled that C.F.'s reputation "is right squarely put in issue in the case" and, over the complainants' objection, admitted that testimony and similar testimony of other witnesses called later by the respondents.

On appeal, the parties agree that, as a general rule, evidence of reputation for integrity and veracity is inadmissible in a civil case to show that a person acted in keeping with that reputation on a particular occasion. *See National U. F. Ins. Co.* v. *Burkholder*, 116 Va. 942, 945, 83 S.E. 404, 405 (1914). *Contra Model Code of Evidence* Rule 306(1) (1942). In defense of the chancellor's ruling, the respondents cite an exception to the general rule announced and applied in *George* v. *Pilcher*, 69 Va. (28 Gratt.) 299, 315 (1877):

[W]e are of opinion, that whenever the character of a witness for truth is attacked either by direct evidence of want of

truth, or by cross-examination, or by proof of contradictory statements in regard to the material facts, or by disproving by other witnesses material facts stated by him in his examination; or, in general, whenever his character for truth is impeached in any way known to the law, the party calling him may sustain him by evidence of his general reputation for truth.

The complainants contend that the rule in *George* is inapplicable here because, they say, "The character of C. F. Adams was not an issue in the case." We look to the evidence at trial. The complainants testified that C.F. had made an oral promise to execute a will granting them a co-tenancy in the Nunnelee farm. As evidence that no such promise was ever made, the respondents introduced C.F.'s will devising his entire estate to his widow, a document executed only a few months after the complainants moved into Miss Kate's house, and C.F.'s letter of instructions to his widow and his executors which he attached to the will just before his death nearly 20 years later. The complainants introduced a number of witnesses who testified that Edsel and Clara had fully performed their commitment to care for Miss Kate. In this state of the evidence, the jury was required to consider whether, in colloquial parlance, C.F. was "a man of his word" or a prevaricator who had deliberately deceived a member of his own family by making a promise he never intended to keep. As Clara described C.F.'s conduct, "he lied to me . . . when he did not leave . . . one-half of the farm to Edsel and I, that we had worked for, for eight years."

We agree with the chancellor that C.F.'s reputation for integrity and veracity was an issue of fact of crucial relevance to the questions before the jury. Yet, the respondents insist that the rule in *George* does not apply in this case because, they say, that rule "applies only when the truthful character of a witness has been attacked [and] C. F. Adams did not testify since by the time of trial he had been dead over three years."

We adhere to the general rule stated earlier and to the exception to that rule as defined in *George*. The *George* exception must be read and applied, however, in light of the public policy underlying Code § 8.01-397, the so-called "dead man's statute". By the enactment of that statute, the General Assembly imposed two mandates upon the courts. Insofar as pertinent here, the stat-

ute provides that, in an action by or against the heir or personal representative of a decedent, no judgment shall be rendered "in favor of an adverse or interested party founded on his uncorroborated testimony". Obviously, this mandate was designed to protect the estate of a decedent against the hazard of spurious claims.

> One of the purposes of the statute is to prevent a surviving party from having the benefit of his own testimony where, by reason of the death of his adversary, the latter's personal representative is deprived of the decedent's version of the transaction.

*Haynes, Executrix* v. *Glenn*, 197 Va. 746, 752, 91 S.E.2d 433, 437 (1956) (citation omitted); *accord Hereford* v. *Paytes*, 226 Va. 604, 607-08, 311 S.E.2d 790, 792 (1984).

To achieve this purpose, Code § 8.01-397 contains a second legislative mandate: "[A]ll entries, memoranda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence in all proceedings". In effect, the General Assembly made a decedent a witness in any action by or against his personal representative as to any evidence relevant to a matter in issue which he could have given had he been alive at the time of trial.

We hold, therefore, that C.F. was such a witness for purposes of the rule in *George*, and we will affirm the ruling admitting the evidence of his reputation for integrity and veracity.[2]

The complainants assign error to two additional evidentiary rulings. In that portion of Edsel's deposition which the chancellor permitted counsel to read to the jury, Edsel testified that C.F. had sold him a residence and a store at a bargain price and had financed the purchase at a rate of interest below the market level. On appeal, Edsel and Clara object to the admission of that testimony on the ground that "it had nothing to do with the existence of an oral contract . . . as to the Nunnelee farm" and only "aroused sympathy for C. F. Adams". The complainants also

---

[2] In an opinion reaffirming and applying the rule in *George*, we said that, in order to avoid undue prolongation of trials and docket congestion resulting from abuse of the rule, "[a] trial judge can impose reasonable limitations . . . on the number of witnesses who will be permitted to give [character] testimony in any [civil] case." *Redd* v. *Ingram*, 207 Va. 939, 943 n.2, 154 S.E.2d 149, 153 n.2 (1967). Unless we can say from the record that any such limitations imposed constitute an abuse of discretion, we will uphold the rulings of the trial court.

challenge the admission of the testimony of C.F.'s distant cousin, Judy Hoyer. They say that the questions and answers concerning the moral and financial support C.F. gave Judy in connection with certain personal problems "had no bearing on the existence of an oral contract between C. F. Adams and Edsel and Clara Adams." "The only purpose for this evidence," the complainants charge, "was to instill in the minds of the jury sympathy and admiration for the late C. F. Adams."

■ We agree that the testimony of both witnesses was irrelevant to the central issue before the jury. And we accept the complainants' view that evidence of C.F.'s generosity tended to enhance the jury's respect for the decedent. But we find the prejudice suffered by the complainants, if any, was *de minimis*. We will not reverse a judgment for error in the admission of irrelevant evidence unless a review of all the evidence of record discloses a reasonable likelihood that the verdict of a jury would have been different if the trial court had excluded the incompetent evidence. *See Pugsley* v. *Privette*, 220 Va. 892, 901-02, 263 S.E.2d 69, 76 (1980); *Richmond* v. *Day Nursery Ass'n*, 207 Va. 561, 566, 151 S.E.2d 370, 374 (1966); *Flannagan* v. *Mutual Ins. Co.*, 152 Va. 38, 70, 146 S.E. 353, 362 (1929), *overruled on other grounds, Gilley* v. *Union Life Ins. Co.*, 194 Va. 966, 76 S.E.2d 165 (1953); *Norfolk Ry. & L. Co.* v. *Spratley*, 103 Va. 379, 384-85, 49 S.E. 502, 504 (1905). *See also* Code § 8.01-678.

The doctrine of harmless error is particularly apposite in chancery causes where a jury's verdict "is not binding but is merely persuasive", *Harris* v. *Citizens Bank, Etc., Co.*, 172 Va. 111, 133, 200 S.E. 652, 660 (1939), and the chancellor, like a trial judge sitting in a law case without a jury, is presumed to have excluded from his analysis of the issues all incompetent evidence, *Richard Eckhart* v. *Commonwealth*, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981). Applying the doctrine here, we hold that the admission of the testimony the complainants challenge was harmless error.

■ Finally, the complainants argue that "the trial court erred in entering judgment upon the verdict, since there was no evidence presented by either side upon which the jury could have inferred that the complainants had not performed their part of the agreement." The complainants misconstrue the content and import of the jury's verdict. In answer to interrogatories, the jury found that an oral contract had been made; that the terms of that contract

did not include a promise on C.F.'s part to devise the complainants a moiety in the Nunnelee farm; and, hence, that a denial of a decree requiring specific performance of such a promise would not be inequitable or unjust. Nothing on the face of the verdict form or elsewhere in the record suggests that the jury based its verdict on a finding that Edsel and Clara had not performed their part of the agreement.

Finding no reversible error in the court below, we will affirm the chancellor's decree.

*Affirmed.*

COMPTON, J., dissenting.