## FOREIGN MISSION BOARD OF THE SOUTHERN BAPTIST CONVENTION

### v.

### JENNIFER WADE, ET AL.

Record No. 901690

### JENNIFER WADE, ET AL.

### v.

## FOREIGN MISSION BOARD OF THE SOUTHERN BAPTIST CONVENTION

Record No. 901729

September 20, 1991

Present: Carrico, C.J., Compton, Stephenson, Russell,* Whiting, Lacy, and Hassell, JJ.

* Justice Russell participated in the hearing and decision of this case prior to the effective date of his retirement on July 1, 1991.

*Lewis T. Booker (Brian V. Otero; Hunton & Williams*, on briefs), for appellant.
*John C. Lowe (Gary L. Holmes; Kenneth A. Norsworthy; Norsworthy and Whitaker*, on brief), for appellees.

JUSTICE LACY delivered the opinion of the Court.

In 1976 Diana and George Thomas Wade, Jr. were appointed as career missionaries for the Foreign Mission Board of the Southern Baptist Convention (the Board). Mr. and Mrs. Wade went to Africa accompanied by their minor children, Renee, Jennifer, Tanya, and George, and performed missionary work for the Board at several different locations.

In 1982, while attending school in Johannesburg, South Africa, Renee Wade told Dr. Marion Jerome Fray, Jr., the Associate Director for the Board's southern and eastern Africa areas, that her father had sexually molested her. Dr. Fray instructed Renee not to repeat her statements to her mother or to anyone else. Dr. Fray consulted with a professor of pastoral counseling and a psychiatrist, but did not relay Renee's statements to Mrs. Wade. When Mr. Wade was confronted by Dr. Fray, he admitted the abuse, but refused to tell his wife of the incident and refused to attend counseling until he returned to the United States. The family returned to the United States on an extended leave in April 1984.

After their return, Renee told her mother that her father had sexually abused her. Mr. Wade's sexual abuse of the other daughters also came to light. In 1985 he was convicted of child abuse and sentenced to a twelve-year prison term.

In 1988 Renee Wade, then an adult, and Mrs. Wade, on behalf of her minor children, sued the Board for breach of contract, negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, civil conspiracy, and "outrage". Mrs. Wade maintained that, at a candidacy conference held just before the Wades completed training for their missionary appointment and assignment, she entered into an oral contract with the Board whereby the Board promised that if she and her husband would become missionaries, the Board would provide protection for the health, welfare, and safety of their family. Relying on this con-

tract, she went with her husband to Africa accompanied by their children.

Mrs. Wade and her children sought damages from the Board alleging that the Board, knowing of Mr. Wade's behavior, nevertheless failed to secure medical care for Renee, to inform Mrs. Wade, and to protect the children from further abuse.

At the close of the evidence, the trial court dismissed the negligence count and submitted the case to the jury on the breach of contract claim.[1] The jury returned a verdict in favor of the Wade children, awarding approximately $1.5 million in damages. The trial court denied the Board's motion to set aside the verdict or grant a new trial, and entered judgment on the jury verdict on October 2, 1990. We consolidated the Board's appeal and the Wades' cross appeal, and address both in this opinion.

## I.

## THE FOREIGN MISSION BOARD APPEAL

We first consider the Board's contention that the trial court erroneously allowed the jury to determine whether the oral contract imposed a duty upon the Board to take steps to protect the Wade children from their father's actions. The Board argues that there was no ambiguity in the contract regarding this issue and, therefore, the court, rather than the jury, had the duty to construe the contract. The Wades respond that the oral contract was capable of various interpretations, that it was not limited to protecting the health, safety, and welfare of the family from external threats, and, therefore, that the trial court properly submitted the interpretation of the contract to the jury.

■ When a court considers a written contract, the intent of the parties is presumed to be embodied in the contractual terms. If those terms are clear and unambiguous, it is the duty of the court to enforce them. Submitting a written contract to the jury for interpretation is proper only when the language is ambiguous. *Winn v. Aleda Constr. Co.*, 227 Va. 304, 307, 315 S.E.2d 193, 195 (1984).

■ Here, however, the intent of the parties has not been memorialized in writing. The standard for determining the intent of the parties to an oral contract is one of reasonable expectation —

---

[1] The trial court previously had dismissed all other counts on various grounds not at issue here.

that is, the meaning which the party using the words should reasonably have expected them to be given by the other party. *Richmond Eng. & Mfg. Corp.* v. *Loth*, 135 Va. 110, 140-42, 115 S.E. 774, 782-83 (1923). 4 S. Williston, A Treatise on the Law of Contracts §§ 603, 605 (3rd ed. 1961). Interpretation of this contract requires a determination not of what *could be* within its scope, but of what the Board *could anticipate Mrs. Wade would reasonably expect* the contract to encompass. Whether the interpretation of the contract was for the court or the jury depends on whether the evidence on that issue was clear or ambiguous. If, from the evidence presented, reasonable people could draw different conclusions as to reasonable expectations of the parties, the question of the meaning of the contract is properly presented to a jury for resolution. *Richmond Inc.* v. *Ewing's Sons*, 200 Va. 593, 596, 106 S.E.2d 595, 597 (1959).

The only evidence concerning the terms of this contract is found in the following testimony of Mrs. Wade:

Q. What did they tell you or what did you ask them about your children, what would happen to them in Africa?

A. We discussed their schooling. We discussed health issues, whether doctors would be available, how we would take care of the health of our children, what kind of services would be available, what the Board's requirements were, like a yearly physical was required to check on them, on the couple and the family.

We knew that Africa was a very unstable continent, and we had questions about our safety and what the Board would do at that time.

Q. Did any of the representatives there in the sessions or individually with you make any representations to you in the areas of health, welfare, and safety of you and your family?

. . .

[W]hat did they tell you in the area of the health, welfare, and safety of you and your family in Africa?

A. They answered our questions about that, that there was a very top priority given to the health, safety and welfare of our family, and that we would be supported in every way we possibly could be.

Q. Did they guarantee your safety in any way?

A. Yes, they did; that if a situation became volatile that they would immediately do anything necessary to get us to a safe place.

. . .

And the other aspect of that was that we were able to tell our families that their grandchildren were going to be safe as well.

. . .

Q. Let me ask you this: How important was it to you that the health, welfare, and safety of your family be guaranteed before you would agree to take them to Africa at that time?

A. I would not have gone had that not been guaranteed.

. . .

Q. Do you claim the Board had an obligation to guarantee nothing bad ever happened to you or your children?

A. No sir.

Q. What was the commitment made to you with regard to the best efforts or the efforts that would be made as to your health, safety, and welfare by the Board during the candidacy?

A. That they would do everything that they could to let us have health, welfare, and safety.

■ This evidence shows that issues of health, safety, and welfare protection were discussed in the context of overseas missionary assignments. Mrs. Wade was aware of, and concerned about,

potential physical danger from sources external to the family unit, illness and other medical problems stemming from the living conditions, and difficulties in securing educational instruction for the children. There is no evidence, however, which would support a finding that the parties contemplated that the Board would be obligated to protect one family member from the criminal actions of another family member.

Indeed, on this record, although Mr. Wade's actions were unconscionable and the impact on the family tragic, no reasonable person could conclude that in 1976 either Mrs. Wade or the Board intended that the oral contract regarding protection of the health, safety, and welfare of the Wade family encompassed the Board's protection of the Wade children from the felonious acts of Mr. Wade. Therefore, the trial court improperly submitted the question of the interpretation of the contract to the jury, and we hold, as a matter of law, that the Board did not have a contractual duty to protect. Mrs. Wade and her children from the unlawful actions of Mr. Wade. Accordingly, we will reverse the judgment of the trial court and enter judgment for the Board.[2]

## II.

## THE WADES' APPEAL

The Wades assign error to the trial court's action in striking their negligence count. They maintain that the evidence showed that the Board breached its duty to them "by failing to use ordinary care to protect them from the continued child sexual abuse of their father."[3]

Relying primarily on *Kamlar Corp.* v. *Haley*, 224 Va. 699, 299 S.E.2d 514 (1983), *Wright* v. *Everett*, 197 Va. 608, 90 S.E.2d 855 (1956), and *Spence* v. *Norfolk & W. R. Co.*, 92 Va. 102, 22 S.E. 815 (1895), the Wades assert that "breach of a duty imposed by contract provides the cause of action in tort, and proof of an independent, willful tort is only necessary for the award of punitive

[2] In light of this holding, it is unnecessary to consider the Board's remaining assignments of error.

[3] The Wades also claimed that the Board's duty to them was breached by "negligently retaining Mr. Wade as an employee after learning that he was a child abuser." The Wades did not discuss their claim of negligent employment retention on brief or in oral argument, and we consider that argument abandoned. *Tidewater Assoc. of Homebuilders, Inc.* v. *City of Virginia Beach*, 241 Va. 114, 118 n.2, 400 S.E.2d 523, 525 n.2 (1991).

damages." The cases cited by the Wades establish the principle that punitive damages are recoverable only if an independent tort is pled and proved. They do not, however, stand for the proposition that the breach of a contractual duty constitutes an independent tort, the basis of a negligence action.

*Wright* and *Kamlar* each addressed the propriety of an award of punitive damages in an action for breach of contract. We recognized that in certain circumstances the actions of the party breaching the contract can show "both a breach of the contract terms and a tortious breach of duty." *Kamlar*, 224 Va. at 705, 299 S.E.2d at 517. But the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract. *Spence*, 92 Va. at 116, 22 S.E. at 818.

The trial court held that the Board had no common law duty of care to the Wades, and that ruling was not appealed. In essence, the Wades seek to establish a tort action based solely on the negligent breach of a contractual duty with no corresponding common law duty. Therefore, the trial court properly dismissed the negligence count and we will affirm its judgment.

Record No. 901690: *Reversed and final judgment.*
Record No. 901729: *Affirmed.*