Present:  All the Justices

PREFERRED SYSTEMS SOLUTIONS, INC.

v.   Record No. 111906

GP CONSULTING, LLC

                                    OPINION BY
                            JUSTICE LEROY F. MILLETTE, JR.
                                 September 14, 2012

GP CONSULTING, LLC

v.   Record No. 111907

PREFERRED SYSTEMS SOLUTIONS, INC.

          FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                    R. Terrence Ney, Judge

     These companion appeals arise out of a dispute between a

government contractor, Preferred Systems Solutions, Inc. (PSS),

and one of its subcontractors, GP Consulting, LLC (GP).  PSS

sued GP following GP's termination of its contract with PSS and

its commencement of a subsequent contract with Accenture, LLP,

a PSS competitor.  PSS alleged breach of contract,

misappropriation of trade secrets, and tortious interference

with contract, seeking injunctive as well as monetary relief.

PSS was ultimately awarded $172,395.96 in compensatory damages

based on the circuit court's finding that GP breached the

noncompete clause in the parties' contract.

     On appeal, GP challenges the circuit court's finding of

liability on the breach of contract claim and the resulting

award of damages, as well as the admissibility of portions of

1

the testimony of PSS' corporate representative.  PSS challenges the circuit court's refusal to grant injunctive relief, its failure to award damages on the tortious interference claim, and its dismissal of the trade secret claim.  We affirm the judgment of the circuit court.

## I.  Background

PSS is an information technology contractor that was part of a team of contractors providing system solutions for the federal Defense Logistics Agency (DLA).  The team of ten contractors, including Accenture, worked under a blanket purchase agreement, which did not in itself guarantee work or funds but rather set up a structure wherein DLA would issue task orders that contractors would complete and be paid in increments according to specific deliverables.  In this structure, Accenture was the "team leader" and retained some degree of oversight but was also a competitor which itself produced deliverables.

The initial funding source for DLA's systems solutions project was called the Business Systems Modernization program (BSM).  PSS subcontracted with GP, a consulting firm that provided the services of a programmer, Sreenath Gajulapalli, to assist in the systems solutions work that PSS was completing for DLA.  The Subcontractor Agreement for Services, referred to as a "basic agreement," was to apply to all future work

2

assignments between PSS and GP until the agreement was terminated.  The agreement included a covenant not to compete, which stated:

> During the term of this Agreement and for twelve (12) months thereafter, [GP] hereby covenants and agrees that they will not, either directly or indirectly:
>
>    (a)    enter into a contract as a subcontractor with Accenture, LLP and or [sic] DLA to provide the same or similar support that PSS is providing to Accenture, LLP and/or DLA and in support of the DLA Business Systems Modernization (BSM) program.
>
>    (b)    enter into an agreement with a competing business and provide the same or similar support that PSS is providing to Accenture, LLP and/or DLA and in support of the DLA Business Systems Modernization (BSM) program.

In 2007, the BSM program reached "operational capability" and support for the program transferred into "sustainment," meaning that the program was live and only required periodic maintenance.  At this point, DLA's funding source to sustain BSM no longer arose out of the BSM program but rather out of its successor program, the Enterprise Business Systems program (EBS), a funding source that also included other initiatives not originally included in BSM.

On February 13, 2010, after giving the requisite two weeks' notice, GP terminated its subcontract with PSS.  On February 16, GP began working for Accenture.  At the time GP

3

left PSS, it was supporting EBS; at Accenture, it continued to do the same work.

In May 2010, PSS filed a complaint against GP in the Circuit Court of Fairfax County, alleging breach of contract, tortious interference with contract, and misappropriation of trade secrets. PSS prayed for compensatory and punitive damages and an injunction requiring GP to cease employment with Accenture and refrain from using PSS' confidential information. The circuit court dismissed PSS' trade secret claim on GP's demurrer.

At trial, PSS' sole witness was its senior vice president of corporate development, Michael Cuccia. GP presented testimony from a project manager at DLA, Patricia Whitington, and from GP's programmer, Gajulapalli. In a letter opinion, the circuit court held that GP "plainly breached" the subcontract "when it entered into a contract with Accenture for services in support of the DLA BSM program." The court awarded compensatory damages in the amount of $172,395.96. The court found, however, that PSS failed to prove its claim for tortious interference and rejected its request for injunctive relief.

Both parties now appeal to this Court.

4

## II. GP's Appeal

### A. Enforceability of the Noncompete Clause

GP assigns error to the circuit court's conclusion that the noncompete clause is enforceable, arguing that it impermissibly prohibits indirect competition and is overbroad. We review the enforceability of a covenant not to compete de novo. Home Paramount Pest Control Cos. v. Shaffer, 282 Va. 412, 415, 718 S.E.2d 762, 763 (2011); Omniplex World Servs. v. U.S. Investigations Servs., 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005).

GP first contends that the noncompete clause is ambiguous and was broadly construed by the circuit court. This assignment of error thus requires a multi-tiered analysis. First, we must determine whether the noncompete clause is indeed ambiguous. Second, if so, we must determine the proper construction. Third, we must consider whether the appropriate construction renders the noncompete clause overbroad.

GP argues that the noncompete clause is ambiguous because it can be read two ways: either that the phrase "and in support of the DLA Business Systems Modernization (BSM) program" narrows the function to which the clause applies, or, in the alternative, that the same phrase is merely descriptive of the work PSS provided to Accenture or DLA but not proscribing GP's potential work. GP argues that the circuit

5

court employed the latter interpretation and that such an interpretation renders the clause overbroad.

Whether the language of a contract is ambiguous is a question of law that we review de novo. Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 631, 561 S.E.2d 663, 667 (2002). We have said that "[c]ontract language is ambiguous when 'it may be understood in more than one way or when it refers to two or more things at the same time.'" Id. at 632, 561 S.E.2d at 668 (quoting Granite State Ins. Co. v. Bottoms, 243 Va. 228, 234, 415 S.E.2d 131, 134 (1992)). Yet we have also explained:

> Contracts are not rendered ambiguous merely because the parties or their attorneys disagree upon the meaning of the language employed to express the agreement. Even though an agreement may have been drawn unartfully, the court must construe the language as written if its parts can be read together without conflict.

Doswell Ltd. P'ship v. Virginia Elec. & Power Co., 251 Va. 215, 222-23, 468 S.E.2d 84, 88 (1996) (internal citation omitted). "Words that the parties used are normally given their usual, ordinary, and popular meaning." D.C. McClain, Inc. v. Arlington Cnty., 249 Va. 131, 135, 452 S.E.2d 659, 662 (1995). Additionally, "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." Id. at 135-36, 452 S.E.2d at 662.

6

With this guidance, we conclude that the noncompete clause at issue here is unambiguous. Although the language of the noncompete clause is not a model of artful construction, the ordinary meaning of the conjunctive "and" suggests an additional requirement rather than a descriptive phrase. Moreover, if the phrase in question was merely descriptive, it would have been needlessly redundant.

While we are not bound by the circuit court's interpretation of the contract, Eure, 263 Va. at 631, 561 S.E.2d at 667, we note that its letter opinion suggests that it also considered the noncompete clause to be unambiguous, stating that it was "very narrowly drawn" and "specific as to what type of work was to be prohibited." Furthermore, the high level of specificity of the circuit court's factual finding of the breach – finding not merely that GP entered into a contract with Accenture for similar services but specifically services "in support of the DLA BSM program" – suggests that the court likewise viewed this phrase as a functional element of the clause.

Having determined the unambiguous meaning of the noncompete clause, we now turn to the question of whether it is overbroad.

Restraints on trade are not favored in Virginia; hence, contracts in restraint of trade are enforceable only if

"narrowly drawn to protect the employer's legitimate business interest, . . . not unduly burdensome on the employee's ability to earn a living, and . . . not against public policy." Omniplex, 270 Va. at 249, 618 S.E.2d at 342. The employer bears the burden of proving these factors. Modern Env'ts, Inc. v. Stinnett, 263 Va. 491, 493, 561 S.E.2d 694, 695 (2002). In evaluating these factors, we consider the function, geographic scope, and duration of the restriction. Home Paramount, 282 Va. at 415, 718 S.E.2d at 764 (citing Simmons v. Miller, 261 Va. 561, 581, 544 S.E.2d 666, 678 (2001)). We assess these elements together rather than as distinct inquiries. Id. at 415-16, 718 S.E.2d at 764.

Here, the duration element is narrowly drawn to a period of only twelve months. We have also established that the function element is narrowly drawn to work in support of a particular program run under the auspices of a particular government agency, limited to the same or similar type of information technology support offered by PSS on the BSM program.

The circuit court found that the noncompete clause proscribed work for only two specific companies – Accenture and DLA. That finding, however, ignores part (b), which speaks generally to a "competing business." As the work done for this "competing business" is likewise restricted to work on the BSM

8

program, this restriction is thus limited to only companies who have successfully bid with DLA to work on the BSM project. The blanket purchase agreement indicates that this group consisted of eight companies in addition to PSS and Accenture. For context, the circuit court made note of the testimony of PSS' corporate representative that there were 400-500 other programming jobs supporting the exact same software system in the Washington, D.C., area alone that were not proscribed by this agreement.

GP additionally alleges that the language of the contract fails to limit its scope to direct competitors. This Court has held restrictive covenants unenforceable when the alleged form of competition was too indirect and tenuous. See, e.g., Home Paramount, 282 Va. at 418, 718 S.E.2d at 765 (holding a restrictive covenant overbroad – and hence unenforceable — because it prohibited any involvement, even as a passive investor, in the pest control business). This line of precedent does not, however, stand for the proposition that the word "indirect" acts as a per se bar to enforcement. The word "indirectly" in the clause at issue here is an adverb modifying the verb phrase "enter into [a contract]." This wording merely bars the circumvention of the otherwise valid restrictive covenant by engaging in a series of subcontracts so as not to directly enter into a contract with the proscribed competitors.

In other words, GP cannot do indirectly what it is directly prohibited from doing.  The clause, in sum, does not prohibit indirect competition but rather prohibits GP from entering into a contract as a subcontractor or sub-subcontractor with Accenture, DLA, or any other competing business to provide the same or similar support that PSS is providing in support of the BSM program.

The lack of a specific geographic limitation is not fatal to the covenant because the noncompete clause is so narrowly drawn to this particular project and the handful of companies in direct competition with PSS.  We accordingly conclude that the noncompete clause is not overbroad and is thus enforceable.

### B.   Factual Finding of Breach

GP also assigns error to the circuit court's finding that it breached the noncompete clause, arguing that there was no evidence presented that GP's work at Accenture was on the BSM program.  We find evidence sufficient to support the judgment.

Following a bench trial, a finding of fact by the trial court will not be disturbed unless it is "plainly wrong or without evidence to support it."  Cardinal Dev. Co. v. Stanley Const. Co., 255 Va. 300, 302, 497 S.E.2d 847, 849 (1998) (citations omitted).  PSS' corporate representative did provide testimony that BSM was "the same as" EBS.  Even the DLA project manager, testifying on behalf of GP, indicated that the

software put in place during the original phase of BSM required ongoing support or sustainment that was at least a part of EBS. The circuit court made an explicit factual finding that GP was working "in support of" BSM when the company began to work for Accenture.  We cannot say that this finding rises to the level of plain error.

### C.  Admissibility of Cuccia's Testimony

GP additionally assigns error to the circuit court's admission of portions of PSS' corporate representative Cuccia's testimony based on two grounds:  that elements of the testimony constituted inadmissible hearsay and that elements of the testimony were speculative.

The record does indeed reflect an objection based on hearsay.  It does not, however, reflect contemporaneous objections to any part of Cuccia's testimony as being speculative.  This allegation occurs for the first time in GP's closing brief.  In the context of a bench trial, we have previously recognized that a challenge to the sufficiency of evidence may be preserved for appeal when made in closing argument.  Little v. Cooke, 274 Va. 697, 718, 652 S.E.2d 129, 142 (2007); see also Fortune v. Commonwealth, 14 Va. App. 225, 227, 416 S.E.2d 25, 27 (1992).  An argument first made in closing, however, has never been allowed in a manner so as to obviate the requirement of a contemporaneous objection when

11

challenging the admissibility of witness testimony.  This is particularly true for an objection alleging that testimony is speculative, because such an objection often invites further questioning of the witness so as to determine the basis for his claims.  To hold otherwise would eviscerate the contemporaneous objection rule in bench trials and undermine the adversarial process.  The challenge to the testimony as speculative is thus barred under Rule 5:25.

The hearsay objection can be found during the questioning of Cuccia by the circuit court during direct examination.  The trial court is permitted to question witnesses; we have said that it "has a right and, indeed, at times a duty to question a witness provided [it] does not disclose bias in so doing." Goode v. Commonwealth, 217 Va. 863, 865, 234 S.E.2d 239, 240 (1977) (citing Skipper v. Commonwealth, 195 Va. 870, 879, 80 S.E.2d 401, 406 (1954), and Mazer v. Commonwealth, 142 Va. 649, 655, 128 S.E. 514, 516 (1925)); see also Va. R. Evid. 2:614(b) ("In a civil or criminal case, the court may question witnesses, whether called by itself or a party, subject to the applicable rules of evidence.")  While this Court has advised caution in the judicial interrogation of witnesses in a jury trial out of concern that the jury might perceive a bias and thus be prejudiced, Goode, 217 Va. at 865, 234 S.E.2d at 240, no such concern is present in a bench trial, affording the

trial court further leeway.  See Flannery v. Norfolk, 216 Va. 362, 368, 218 S.E.2d 730, 735 (1975) ("[J]udges are suited by training and experience to disregard potentially prejudicial comments.").

At the request of the circuit court, Cuccia clarified statements concerning PSS' inability to simply reassign GP's work to another subcontractor.  Cuccia testified that PSS was unable to replace GP because Accenture took PSS' place fulfilling DLA's needs:  the task or "billet" was still being performed by GP but billed through Accenture rather than PSS.

Counsel for GP stated his hearsay objection as follows: "Mr. Cuccia just testified to funding not being provided and opportunities not being provided, and so forth, and I think that's hearsay at this point.  There's certainly no documentary evidence before us that shows that funding was cut off or they didn't receive funding."

It is incumbent on the objecting party to state with clarity his objection "and his grounds therefor," Code § 8.01-384(A), so that the trial court is provided "an opportunity to rule intelligently" on that issue.  United Leasing Corp. v. Lehner Family Bus. Trust, 279 Va. 510, 519, 689 S.E.2d 670, 675 (2010) (internal quotation marks omitted); see also Va. R. Evid. 2:103(a)(1) ("Error may not be predicated upon admission . . . of evidence, unless . . . [a]s to evidence admitted, a

13

contemporaneous objection is stated with reasonable certainty as required in Rule 5:25 . . . .").

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Va. R. Evid. 2:801(c); Burns v. Gagnon, 283 Va. 657, 682, 727 S.E.2d 634, 649 (2012).  Based on counsel's explanation, however, the objection was not aimed at any one particular statement by the witness but rather at the basis for Cuccia's knowledge – that his knowledge arose from out-of-court documents.[*]  An intelligent ruling in this instance required further factual inquiry into the basis for Cuccia's statements to the judge: whether his statements arose from personal knowledge or from documents not in evidence.

The questioning of witnesses lies in the sound discretion of the trial court, and the standard of review as to the admissibility of testimony is abuse of discretion.  Avent v. Commonwealth, 279 Va. 175, 197, 688 S.E.2d 244, 256 (2010) (citing John Crane, Inc. v. Jones, 274 Va. 581, 590, 650 S.E.2d 851, 855 (2007)).  As we have said, the trial court is

_____

[*] Although the stated ground perhaps goes most properly to lack of personal knowledge rather than hearsay, the circuit court understood the nature of the objection and the two issues were sufficiently linked due to the alleged out-of-court documents so as to consider the issue preserved under Rule 5:25.

permitted to question witnesses.  In a bench trial, when such questioning elicits testimony the admissibility of which depends on disputed underlying facts, it is well within the discretion of the trial court to permit counsel to explore these facts during examination of the witness.  See Va. R. Evid. 2:611(a) ("The mode and order of interrogating witnesses and presenting evidence may be determined by the court so as to . . . facilitate the ascertainment of the truth . . . ."); 2:611(b) (allowing, in addition to questions concerning the subject matter of direct examination and the credibility of the witness, "[t]he court [to], in the exercise of discretion, permit inquiry into additional matters [during cross-examination] as if on direct examination").

In accordance with that discretion, the circuit court did not rule immediately on the objection.  Instead, it stated: "Well, he's been responding to my questions.  You're going to have the opportunity to cross-examine."

PSS had already laid reasonable grounds for the conclusion that the testimony was within Cuccia's personal knowledge.  PSS established on direct examination that he was senior vice president of corporate development for PSS, that his duties included serving as acting manager for the programming support offered to DLA, and that he was familiar with the history of

15

PSS and its information technology contracting with the federal government.

The circuit court gave GP the opportunity to challenge the foundation of Cuccia's testimony and whether it was supported by a sufficient basis of personal knowledge during cross-examination.  GP indeed asked questions relating to funding changes and further developed that testimony during cross.  Cuccia admitted that he did not know whether PSS' contract value was affected by GP's move (a statement that was possibly but not clearly referring to the contract value of the blanket purchase agreement rather than a particular task order).  He maintained that PSS nonetheless incurred a loss because it was paid on the basis of deliverables and task orders that involved a calculation of "full-time equivalents," or hours built up, and he was not "allow[ed] to fill the billet because the . . . full-time equivalents hours on the task order were taken away as a result of GP [conducting the same work for Accenture]."  Cuccia confirmed that no task orders or documents of full-time equivalents were entered into evidence by PSS.  GP did not renew the hearsay objection, however; nor did it ask that the circuit court rule on its earlier objection.

The mere failure to introduce corroborating task orders or other documents, while perhaps raising issues of credibility, does not suffice to render the testimony of a corporate

16

representative inadmissible.  The only fact relevant to the objection is whether these documents were the sole source of his knowledge of funding, and this was neither asked nor established.

Never having been asked to revisit the objection, the circuit court did not make a clear ruling on the issue.  Unlike a jury, however, the trial court when sitting as the finder of fact "is presumed to have excluded from [its] analysis of the issues all incompetent evidence" that might surface during testimony.  Adams v. Adams, 233 Va. 422, 429, 357 S.E.2d 491, 495 (1987).  Given this presumption and the lack of compelling evidence in the record to suggest that the testimony was inadmissible, we are unable to conclude that the circuit court erred in its consideration of Cuccia's testimony.

### D.  Lost Profits

In denying PSS' tortious interference claim, the circuit court found that there was no guarantee of future contracts between PSS and DLA, and that PSS failed to prove that it could not hire other subcontractors who could do the same work.  GP alleges that, in light of these factual findings, PSS cannot demonstrate lost profits and therefore is not entitled to compensatory damages.  GP additionally argues that the quantum of damages is speculative.  We disagree.

17

## 1. Future Contracts

When a noncompete clause is breached, the nonbreaching party is entitled to the benefit of the bargain: to "put[] the party injured in the same position, as far as money can do it, as he would have been if the contract had been performed." Appalachian Power Co. v. John Stewart Walker, Inc., 214 Va. 524, 535, 201 S.E.2d 758, 767 (1974) (internal quotation marks omitted). In order to prove lost profits, as claimed here, PSS had to show: (1) that Accenture billed the work in question; (2) that PSS would have continued to bill for the work had the work not moved to Accenture; and (3) the amount that PSS would have made from billing the work. Western Insulation, LP v. Moore, 242 Fed. Appx. 112, 120 (4th Cir. 2007) (applying Virginia law in overruling the award of compensatory damages in a noncompete case). In this assignment of error, GP questions whether the circuit court's explicit factual finding that there was no guarantee of future contracts with DLA bars recovery by implying that PSS failed to prove the second element. We hold that it does not.

The circuit court observed that there was no "guarantee" of future contracts between PSS and DLA; indeed, the blanket purchase agreement did not obligate DLA to continually offer task orders, and no contractual promise of a year's worth of future task orders apparently existed, due to the manner in

18

which the government contractors were paid.  The standard of proof, however, is not that of a "guarantee."  The plaintiff is tasked merely with proving the elements of damages from lost profits by a preponderance of the evidence.  See Agostini v. Consolvo, 154 Va. 203, 217, 153 S.E. 676, 680 (1930).  Despite its factual finding that no future contract was guaranteed, the circuit court could still have found by a preponderance of the evidence that PSS would have continued to bill for the work had GP not moved to Accenture.

This factual finding, necessarily implied by its award of damages on the breach of contract claim, is "entitled to the same weight as a jury verdict," Jean Moreau & Assocs. v. Health Ctr. Comm'n, 283 Va. 128, 142, 720 S.E.2d 105, 113 (2012) (internal quotation marks omitted), and we will not disturb it unless it is "plainly wrong or without evidence to support [it]."  Id. (internal quotation marks omitted); Code § 8.01-680.

PSS provided evidence of a track record of its own purchase orders with GP for EBS-related work, a method long accepted in Virginia to establish evidence of lost profits. Commercial Bus. Sys. v. Bellsouth Servs., 249 Va. 39, 50, 453 S.E.2d 261, 268-69 (1995).  PSS then provided a year's worth of GP's bills to Accenture for EBS-related work of a similar nature, with similar billing titles.  PSS' corporate

19

representative testified that, prior to GP's move to Accenture, PSS had a business expectancy of continued work from DLA to be billed through PSS to GP. No evidence was presented by GP that, absent GP's move to Accenture, Accenture would have nonetheless moved the billet in question from PSS. We cannot say that the circuit court plainly erred in finding by a preponderance of the evidence that, absent the breach, PSS would have continued to bill and to be compensated for the work performed by GP for Accenture.

## 2. Calculation of Lost Profits

Claims for compensatory damages – in this case, lost profits – must be proved with reasonable certainty. ADC Fairways Corp. v. Johnmark Constr., Inc., 231 Va. 312, 318, 343 S.E.2d 90, 93 (1986). The standard of review for a damages calculation has been framed as whether there were "sufficient facts" to support the award. Nichols Constr. Corp. v. Virginia Machine Tool Co., 276 Va. 81, 89, 661 S.E.2d 467, 472 (2008) (internal quotation marks omitted). We have said that damages awards must not be "contingent, speculative, or uncertain." Sunrise Continuing Care, LLC v. Wright, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009). "Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded." Washington Golf & Country Club, Inc. v. Briggs &

<u>Brennan Developers, Inc.</u>, 198 Va. 586, 592, 95 S.E.2d 233, 238 (1956) (internal quotation marks omitted).

As stated earlier, calculation of lost profits based on the track records of profits in established companies has long been an accepted method of estimating damages awards. <u>See, e.g.</u>, <u>Commercial Bus. Sys.</u>, 249 Va. at 50, 453 S.E.2d at 268 ("When an established business, with an established earning capacity, is interrupted and there is no other practical way to estimate the damages thereby caused, evidence of the prior and subsequent record of the business has been held admissible to permit an intelligent and probable estimate of damages." (quoting <u>Mullen v. Brantley</u>, 213 Va. 765, 768, 195 S.E.2d 696, 699-700 (1973))). While never explicitly addressed in Virginia in the context of a noncompete clause, several of our sister states have approved the use of subsequent profits from the benefiting competitors as evidence in damages calculations for breach of covenants not to compete, provided that the profits can be sufficiently tied to the injured party. <u>E.g.</u>, <u>Trilogy Network Sys. v. Johnson</u>, 172 P.3d 1119, 1121 (Idaho 2007); <u>TruGreen Cos. v. Mower Bros.</u>, 199 P.3d 929, 933 (Utah 2008). Here, PSS used not the exact profits of Accenture, but rather the time billed to Accenture combined with its own established profit margin to calculate damages. The circuit court used these figures to arrive at what it deemed to be a reasonable,

non-speculative award of damages.  We find no error in the circuit court's determination.

### 3.  Other Subcontractors

The circuit court's factual finding on the tortious interference claim that PSS "failed to show that it could not have hired other subcontractors who could have done the same work" is irrelevant to the award of compensatory damages for breach of contract.  The ability of PSS to hire other, equally qualified subcontractors is rendered immaterial in light of Cuccia's unrefuted testimony that Accenture moved the billet for this work from PSS to Accenture.  Absent this billet, PSS would not have been able to receive funding for or pay a subcontractor hired to replace GP.  The circuit court's finding pertains only to the availability of other qualified contractors; the circuit court made no explicit finding as to PSS' ability to bill DLA for the work of these contractors. The finding of the circuit court therefore does not necessarily conflict with award of damages for breach of contract.

### III.  PSS' Appeal

### A.  Demand for Injunctive Relief

In its first three assignments of error, PSS asserts that the circuit court erred by declining to award injunctive relief in addition to, or in lieu of, compensatory damages for GP's breach of the noncompete clause.  We disagree.

22

"[T]he granting of an injunction is an extraordinary remedy and rests on sound judicial discretion to be exercised upon consideration of the nature and circumstances of a particular case." Levisa Coal Co. v. Consolidation Coal Co., 276 Va. 44, 60, 662 S.E.2d 44, 53 (2008). We thus will not disturb the circuit court's decision to deny PSS injunctive relief "unless it is plainly wrong." Snead v. C&S Props. Holding Co., 279 Va. 607, 613, 692 S.E.2d 212, 215 (2010).

The circuit court provided four reasons for refusing to enjoin GP from working for Accenture: (1) the twelve-month noncompete period had run; (2) PSS waited two months after GP began working for Accenture to bring suit; (3) PSS did not seek a preliminary injunction against GP; and (4) PSS failed to "demonstrat[e] that monetary damages would be inadequate and that only the imposition of an injunction would provide adequate relief." PSS expends much effort refuting the first three reasons, but it gives relatively short shrift to the fourth — which is the one of most significance.

This Court has long said that "[t]o secure an injunction, a party must show irreparable harm and the lack of an adequate remedy at law." Black & White Cars, Inc. v. Groome Transp., Inc., 247 Va. 426, 431, 442 S.E.2d 391, 395 (1994). PSS argues in conclusory fashion that "[t]he damages awarded were inadequate to remedy the irreparable harm suffered by PSS when

GP . . . breached the [noncompete clause]." As support for this claim, PSS relies on the following testimony from Cuccia, which it submits establishes that its investment in DLA's systems "[s]olution go[es] beyond some of the lost profit awarded by the [circuit] court":

> Q. Why does PSS include noncompete terms in its agreements?
>
> A. There is a number of reasons why we do it; one is to protect our business interest, and it takes a lot of resources for the bid and the proposal process to win these types of procurements or these types of blanket purchase order agreements. There's a large investment that's made in obtaining these vehicles, as well as finding the resources to staff these positions. It's a cumbersome, expensive process to find and retain quality resources. So it's, you know, it's something that we take very seriously.
>
> Q. How do you find these quality resources?
>
> A. We have a large recruiting staff that's recruiting these resources based on job descriptions and what the customer is looking for to achieve their mission goals.

This testimony does not support, much less prove, that damages were inadequate to remedy the harm PSS incurred as a result of GP's breach of the noncompete clause; it simply goes to the business need for such a clause. There is no reason that an investment into bidding for "procurements" or recruiting staff could not be a quantifiable, compensable damage to PSS, provided that it could offer the evidence upon which to calculate the amount of damage sustained. The fact

24

that PSS failed to offer any such evidence does not render its harm irreparable.

Furthermore, Cuccia made other statements during his testimony that flatly contradict PSS' argument that damages were inadequate. After testifying that PSS had sustained damages when GP went to work for Accenture, he was asked whether "those damages [could] be calculated." He responded, "Yes," and then went on to describe a method of calculation: "Damages are calculated by looking at what we were – what we bid – the hourly rate that we bid on the task order for those support services and what we are paying for those services. The difference between the two on an hourly rate is damages." Using this method, he was able to offer a numerical calculation that he claimed constituted PSS' "total" damages.

Given that PSS failed to prove a necessary predicate for injunctive relief — that it lacked an adequate remedy at law — we hold that the circuit court was not plainly wrong in declining to enjoin GP from working for Accenture. In light of this conclusion, we need not address PSS' arguments that the circuit court erred by holding PSS accountable for not bringing suit against GP sooner and not seeking a preliminary injunction, and by not allowing PSS to waive damages and elect injunctive relief.

## B. Tortious Interference Claim

In its fourth and fifth assignments of error, PSS argues that the circuit court erred by failing to award compensatory and punitive damages on its tortious interference claim.

The circuit court concluded that PSS had failed to prove its tortious interference claim because it was not "guaranteed" work from DLA "even if GP had continued to work for [PSS]," and because it did not demonstrate that "it could not have hired other subcontractors who could have done the same work."  In addition, the circuit court found that, "even if PSS could have shown that GP's breach tortiously interfered with [PSS'] contract with DLA and/or Accenture," there was no separate harm apart from the harm PSS suffered as a result of GP's breach of the noncompete clause.  (Emphasis omitted.)  We agree that PSS failed to prove its tortious interference claim, but for a different reason.

PSS asserts that GP tortiously interfered with the blanket purchase agreement, which it submits is a nonterminable-at-will contract.  By its terms, however, the blanket purchase agreement does not obligate DLA to do anything until it places an order:  "This [blanket purchase agreement] does not constitute an obligation of any funds.  The Government is obligated only to the extent of the individually specified orders issued under the context of this [agreement]."  In

effect, the blanket purchase agreement is just an agreement to agree: it gives PSS (along with nine other contractors) an opportunity to receive work from DLA, but it does not obligate DLA to provide work. During trial, PSS produced no DLA task order that was operative at the time GP went to work for Accenture. At most, then, PSS' tortious interference claim is one for tortious interference with a business or contract expectancy, not with a nonterminable-at-will contract. See Duggin v. Adams, 234 Va. 221, 226, 360 S.E.2d 832, 836 (1987).

To establish a claim for tortious interference with a business or contract expectancy, PSS was required to show that (1) it had a contract expectancy; (2) GP knew of the expectancy; (3) GP intentionally interfered with the expectancy; (4) GP used improper means or methods to interfere with the expectancy; and (5) PSS suffered a loss as a result of GP's disruption of the contract expectancy. Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co., 254 Va. 408, 413, 493 S.E.2d 375, 378 (1997). PSS was not, however, required to show that GP acted with malice or engaged in any other egregious conduct. Id. at 414, 493 S.E.2d at 378.

Even assuming that PSS established the other elements of its tortious interference claim, it failed to prove that GP used improper methods or means to interfere with PSS' business or contract expectancy with DLA. The only act that PSS points

27

to as evidence of an improper method or means on the part of GP is its breach of the noncompete clause. While improper methods or means need not be "inherently illegal or tortious," id., we hold that the breach of a noncompete clause is not in itself an improper method or means.

Improper methods or means generally involve violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, breach of a fiduciary relationship, violation of an established standard of a trade or profession, unethical conduct, sharp dealing, overreaching, or unfair competition. Duggin, 234 Va. at 227-28, 360 S.E.2d at 836-37. PSS produced no evidence that GP committed any of these acts in connection with its breach of the noncompete clause. Indeed, there is no evidence that GP even acquired or used PSS' trade secrets or confidential information to compete with PSS. Cf. Peace v. Conway, 246 Va. 278, 282, 435 S.E.2d 133, 135 (1993).

We accordingly hold that the circuit court did not err by concluding that PSS had failed to prove its tortious interference claim. In view of this conclusion, we need not address PSS' contentions that the circuit court erred by finding that PSS did not establish that it was "guaranteed"

28

work from DLA, that it could not hire another subcontractor, and that it did not suffer separate harms.

### C. Trade Secret Claim

In its sixth and final assignment of error, PSS asserts that the circuit court erred by dismissing its claim under the Uniform Trade Secrets Act (Act), Code §§ 59.1-336 through -343, on GP's demurrer. According to PSS, its complaint sufficiently alleges the elements of a trade secret claim. We disagree.

The circuit court's sustaining of GP's demurrer is subject to de novo review by this Court. Lee v. City of Norfolk, 281 Va. 423, 432, 706 S.E.2d 330, 334 (2011). In conducting our review, we accept as true the facts alleged in PSS' complaint and give PSS the benefit of all reasonable inferences that may be drawn from those facts. Station #2, LLC v. Lynch, 280 Va. 166, 169, 695 S.E.2d 537, 539 (2010). We do not, however, admit the correctness of PSS' legal conclusions. Yuzefovsky v. St. John's Wood Apts., 261 Va. 97, 102, 540 S.E.2d 134, 137 (2001).

To state a trade secret claim, a plaintiff must allege sufficient facts to establish (1) the existence of a trade secret, and (2) its misappropriation by the defendant. MicroStrategy Inc. v. Li, 268 Va. 249, 263, 601 S.E.2d 580, 588 (2004) (citing Code § 59.1-336). The Act defines a "trade secret" as

29

information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:

> 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

> 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Code § 59.1-336. And it goes on to define "misappropriation" as

> 1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> 2. Disclosure or use of a trade secret of another without express or implied consent by a person who

>> a. Used improper means to acquire knowledge of the trade secret; or

>> b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

>>> (1) Derived from or through a person who had utilized improper means to acquire it;

>>> (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

>>> (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

>>> (4) Acquired by accident or mistake.

Id.

30

In its complaint, PSS makes the following allegations in support of its trade secret claim:

34. PSS' Confidential Information as defined in the [Subcontractor] Agreement is a Trade Secret as defined by Va. Code § 59.1-336.

35. Upon information and belief, GP has and continues to acquire and misappropriate PSS' Trade Secrets.

36. Upon information and belief, GP used improper means to acquire and misappropriate PSS' Trade Secrets.

37. PSS' efforts to secure its Trade Secrets from disclosures are reasonable under the circumstances.

38. GP has a duty to maintain the secrecy of PSS' Trade Secrets.

39. GP's appropriation of the Trade Secrets was willful and malicious.

40. GP used the Trade Secrets with a conscious disregard of PSS' rights and intending to ruin PSS' business, reputation and client relationships.

The Subcontractor Agreement for Services defines "Confidential Information" as

any data or information, other than Trade Secrets, that is of value to PSS and is not generally known to competitors of PSS. Confidential Information shall include, but is not limited to, lists of PSS' current or potential customers, the identity of various suppliers, information about PSS' executives and employees, financial information, price lists, pricing policies and PSS' business methods. Confidential Information also includes information of the type described above which PSS obtains from another party and which PSS treats as Confidential Information, whether or not owned or developed by PSS.

31

We find the allegations in PSS' complaint insufficient to support a trade secret claim. Although Virginia is a notice pleading jurisdiction, see Rule 1:4(d), a complaint must still "contain[] sufficient allegations of material facts to inform a defendant of the nature and character of the claim" being asserted by the plaintiff. CaterCorp, Inc. v. Catering Concepts, Inc., 246 Va. 22, 24, 431 S.E.2d 277, 279 (1993). PSS' complaint fails to meet this standard with respect to the trade secret claim, for it contains nothing more than conclusory assertions. The complaint, for instance, does not identify what trade secrets GP misappropriated; instead, it simply references a laundry list of items that PSS considers to be "Confidential Information." Nor does it identify the improper means by which GP obtained the trade secrets or how GP has used those secrets; rather, it merely states that "GP used improper means to acquire and misappropriate PSS' Trade Secrets" and that "GP used the Trade Secrets with a conscious disregard of PSS' rights and intending to ruin PSS' business, reputation and client relationships."

Because PSS' complaint fails to set forth the material facts necessary to sustain the trade secret claim, we conclude that the circuit court did not err by dismissing the claim on GP's demurrer.

## IV. Conclusion

For the foregoing reasons, we find no error in the circuit court's awarding damages to PSS for lost profits as a result of GP's breach of the noncompete clause.  We also find no error in the circuit court's refusal to grant PSS injunctive relief, its conclusion that PSS failed to prove tortious interference, or its dismissal of PSS' trade secret claim.  The judgment of the circuit court is thus affirmed.

Record No. 111906 – <u>Affirmed.</u>
Record No. 111907 – <u>Affirmed.</u>

JUSTICE McCLANAHAN, concurring.

I agree with the majority opinion.  However, in Part III.B., the Court concludes, without reference to the source of duty rule, that GP's mere breach of the noncompete clause in its employment contract with PSS was insufficient to meet the improper methods or means element for PSS's tortious interference claim.  I write separately to explain that, when such a breach is the sole basis for asserting tortious interference, it is the source of duty rule that renders the claim deficient as a matter of law.

In deciding whether a certain act or occurrence sounds in breach of contract, breach of a duty arising in tort, or both, a court must ascertain "the source of the duty violated." <u>Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.</u>, 256 Va.

33

553, 558, 507 S.E.2d 344, 347 (1998); see Kaltman v. All American Pest Control, Inc., 281 Va. 483, 490-93, 706 S.E.2d 864, 869-70 (2011); Dunn Constr. Co. v. Cloney, 278 Va. 260, 266-67, 682 S.E.2d 943, 946 (2009). This rule "avoid[s] turning every breach of contract into a tort." Dunn, 278 Va. at 267, 682 S.E.2d at 946. Under the rule, damages incurred as a result of the breach of a duty assumed only by a contract, as opposed to a common law or statutory duty, "remain the sole province of the law of contracts." Filak v. George, 267 Va. 612, 618, 594 S.E.2d 610, 613 (2004). As we explained in Foreign Mission Board v. Wade, 242 Va. 234, 409 S.E.2d 144 (1991), "in certain circumstances the actions of the party breaching the contract can show both a breach of the contract terms and a tortious breach of duty"; however, "the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." Id. at 241, 409 S.E.2d at 148 (citations and internal quotation marks omitted)). See Ventas, Inc. v. HCP, Inc., 647 F.3d 291, 311 (6th Cir. 2011) (acknowledging that a mere breach of contract is not sufficient to establish improper means for tortious interference claim); Kapunakea Partners v. Equilon Enters. LLC, 679 F. Supp. 2d 1203, 1217-19 (D. Haw. 2009) (same); JRS Products, Inc. v. Matsushita Elec. Corp. of Am., 8 Cal. Rptr. 3d 840, 852 (Cal. Ct. App. 2004) ("[A] breach

34

of contract claim cannot be transmuted into tort liability by claiming that the breach interfered with the promisee's business.").

Accordingly, I concur with the Court's holding that the circuit court reached the right result in ruling that PSS failed to prove its tortious interference claim against GP.